Aldo Mario **LOVISI** et al.

v.

**A. E. SLAYTON, Jr., Superintendent of the Virginia State Penitentiary, et al.**

Civ. A. No. 420-72-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 31, 1973.

Richard E. Crouch, ACLU, Washington, D. C., T. David Thelen, ACLU of Virginia, Richmond, Va., for plaintiffs.

Robert E. Shepherd, Jr., Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Aldo and Margaret Lovisi, inmates in the Virginia penal system at the time this action was commenced, petition the Court pursuant to 28 U.S.C. § 2254 for writs of habeas corpus holding invalid their convictions under Va.Code Ann. § 18.1–212 of the crime of sodomy. The Lovisis, husband and wife, were convicted and sentenced to a term of two years by the Corporation Court of the City of Virginia Beach of committing sodomy with one another. Margaret Lovisi was also convicted by that Court of committing sodomy with a third party, one Earl Romeo Dunn, for which she received the maximum sentence of three years' confinement.

The petition reveals that the statutory prerequisites required in order to receive relief under 28 U.S.C. § 2254 have been met in this case. Aldo Lovisi is in custody pursuant to the conviction which he now attacks, and Margaret Lovisi was incarcerated at the time the petition was brought. Her petition is not moot by virtue of the rule of Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). State remedies have been exhausted by means of petitions for appropriate writs to the Virginia and United States Supreme Courts, challenging the convictions on the same constitutional grounds here argued. However, because the attack against the constitutionality of § 18.1–212 based on the first amendment's establishment of religion clause was not

raised in the state courts, it will not be considered here.

The sole basis of petitioners' contentions is that the statute under which they were convicted, as applied to them, is unconstitutional. Va.Code Ann. § 18.-1–212 provides the following:

Crimes against nature.—If any person shall carnally know in any manner any brute animal, or carnally know any male or female person by the anus or by or with the mouth, or voluntarily submit to such carnal knowledge, he or she shall be guilty of a felony and shall be confined in the penitentiary not less than one year nor more than three years.

If any person shall by force carnally know any male or female person by the anus or by or with the mouth he or she shall be guilty of a felony and shall be confined in the penitentiary not less than three nor more than ten years.

It is uncontested that the convictions here under attack involve consensual relations between adults. The petition does not, therefore, raise issues of forcible sodomy. Though counsel initially agreed that an evidentiary hearing was not required in order to decide the issue, the Court subsequently concluded that a limited hearing was required to determine two outstanding issues of fact. See memorandum of June 4, 1973. Said hearing was held July 27, 1973. The case has been fully briefed by both sides, oral argument was held, and the matter is now ripe for disposition. The Court finds the following facts from the record and the evidence presented before it.

Earl Romeo Dunn first became acquainted with the Lovisis in March of 1969, by means of a magazine titled "Swingers Life." Answering an ad in this magazine by which the Lovisis made known to the public that they wished "to meet people," Dunn arranged to travel to Virginia Beach from Washington, D. C., to meet with the Lovisis on three occasions. The third such occasion encompassed a trip by the three persons to New York with a return to Virginia Beach on March 30, 1969. The following day, on March 31, Aldo and Margaret Lovisi and Dunn engaged in a *ménage à trois* in the bedroom of the Lovisi's home. The record is undisputed that Margaret Lovisi performed fellatio on both her husband and Dunn. It is for these acts that Margaret was convicted, and it was for allowing her to perform fellatio on him that Aldo was convicted.

The record further reveals that polaroid photographs were taken of the acts in issue. There is sharp controversy, however, as to how the pictures were taken. Dunn testified in each of the trials that they were taken by a self-timing device on Aldo's camera. Margaret did not take the stand in either her own or her husband's sodomy trial, but in a separate prosecution of her husband for corrupting the morals of children, she also testified that the photographs were taken by a self-timing camera. See Lovisi v. Commonwealth, 212 Va. 848, 188 S.E.2d 206, 207 (1972). Carolyn and Eugenia Acree, Margaret Lovisi's daughters, however, testified in each trial that they were present in their parents' bedroom while the acts were being committed and that they had taken the pictures themselves. Both girls, aged 12 and 14 respectively at the time of the trials,[1] were able to describe explicitly the acts which they claimed to have seen and photographed. Both Dunn and Margaret Lovisi vehemently deny that the girls were present. At the plenary hearing of July 27, 1973, the Acree girls were not present, but Aldo Lovisi repeated his testimony that the girls did not view the acts in question and did not take the pictures.

On April 18, 1969, the Virginia Beach police were requested by the local welfare office to attend a meeting at the

---

1. Carolyn Acree was aged 11 at the time of the sexual acts in question, and Eugenia was aged 13.

Alanton Elementary School between the two Acree girls, Margaret Lovisi, welfare officers and the school's principal. It appears that prior thereto the girls had brought a photograph to school which allegedly depicted one of them seated on a sofa beside an adult male. Both girl and man were nude. Although this picture was destroyed by a teacher, it precipitated the conference, at which time the Acree girls stated to a police officer that there were many more similar photographs at their home.

On the strength of this statement, the policeman executed a warrant and searched the Lovisi home. In the course of this search, he uncovered several hundred photographs, four hundred rolls of film, over a thousand paperback books, and numerous magazines, all of which were of an obscene nature. Among the photographs taken from a box in a gun cabinet was a picture of the two Lovisis and Dunn depicting Margaret Lovisi performing fellatio upon Dunn. This was introduced into evidence at Margaret's trial. Other pictures, depicting Margaret performing fellatio on her husband, were identified at Aldo's trial but were not placed into evidence.

■■ Preliminarily, the Court notes the respondents' contention that "great weight" should be accorded the denial of *certiorari* by the United States Supreme Court in this case. This argument is patently without merit. The Supreme Court, time and again, has stated that the denial of *certiorari* should be given no weight, either as *stare decisis* or in federal habeas corpus proceedings on the same case. Chessman v. Teets, 354 U.S. 156, 164, n. 13, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1957); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). Even the recent mention by a majority of the Court of dissents from the denial of *certiorari*, United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), drew sharp criticism from Mr. Justice Marshall. He, speaking of the Court's function in reference to cases it chooses to hear, noted that "[r]eliance

on denial of *certiorari* for *any* proposition impairs the vitality of the discretion we exercise in controlling the cases we hear." 409 U.S. at 461, 93 S.Ct. at 646. The respondents further argue that the Court should consider the petitioners' constitutional claim only if it determines that the state procedures afforded the petitioners did not give them an adequate opportunity to raise this constitutional ground as a defense. In other words, the respondents would have the Court bar itself from considering the constitutionality of the statute upon which the Lovisis were convicted if the state courts had an adequate opportunity to consider this claim. Such a contention, at best, might be argued to the Supreme Court as grounds for overruling Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). In light of the binding effect of these opinions on this Court, however, the respondents' position is not well taken.

The fundamental issue presented by this case is whether the Constitution of the United States prohibits the imposition of criminal sanctions against heterosexual relations between consenting adults involving oral-genital contact. The precise questions raised before the Court are whether the Constitution ever protects acts between adult partners not married to one another, and if the Constitution does provide protection for some acts involving oral-genital sexual contact, whether it protects the particular acts performed by the Lovisis. The Court is faced with the further question of whether, if the Lovisis' conduct was not constitutionally protected, they may attack the constitutionality of Virginia Code Annotated § 18.1–212 on the basis of the rights of third persons. For reasons which follow, it is not necessary for the Court to render an actual holding on the first two questions. It is, however, necessary for the Court to determine on what constitutional grounds, if any, such sexual acts might conceivably be protected in order to decide whether the con-

duct of these petitioners might arguably be protected. As will be seen, while the Court is of the opinion that the right to privacy inherent in the federal constitution may well extend to heterosexual relations involving oral-genital contact between consenting adults, the petitioners in this case, having voluntarily relinquished the privacy that would normally have surrounded their acts, are not themselves protected by such a right. They could, therefore, have been prosecuted for the acts in which they engaged. The Court further holds that they do not have standing to assert the constitutional rights of other persons and thus may not attack the constitutionality of statutes underlying their conviction on this basis. The Court first turns to the nature of the right to privacy and the question of whether the conduct of the Lovisis was constitutionally protected.

■ The federal constitution does not on its face enumerate a substantive right to privacy. Depending on the facts of the case, this right has been viewed as emanating from the first amendment's guarantee of freedom of association, NAACP v. Alabama, 357 U. S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); and of speech, Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L. Ed.2d 542 (1969); the fourth amendment, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); the equal protection clause of the fourteenth amendment, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); the ninth amendment, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); the penumbras of the Bill of Rights, *id.*; and the concept of liberty guaranteed by the due process clause of the fourteenth amendment, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Court is satisfied that the candid approach of Roe v. Wade, *supra,* and of Mr. Justice Harlan's concurrence in Griswold v. Connecticut, *supra,* 381 U.S. at 499, 85 S.Ct. 1678, that the due process clause of the

fourteenth amendment provides substantive protection for fundamental human values "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), represents the preferred view. While other provisions of the Bill of Rights certainly give guidance to what values are to be so enumerated, the Court would be less than candid if it did not recognize that the process of defining these values represents at least in part a return to the ancient, if somewhat discredited, concept of natural law. However, as Mr. Justice Harlan recognized in *Griswold,*

> "[s]pecific" provisions of the Constitution, no less than "due process," lend themselves as readily to "personal" interpretation by judges whose constitutional outlook is simply to keep the Constitution in supposed "tune with the times." 381 U.S. at 501, 85 S.Ct at 1690.

The conclusion that a court reaches from this consideration of its role is that it is duty bound to apply not only what the Constitution expressly states is the law, but also what by necessary implication from the values on which it is based the Constitution implies is the law. In doing so, however, a court must further recognize its duty to apply the law "free of emotion and of predilection," Roe v. Wade, *supra,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, to the end that it does not act as a superlegislature.

■ The right to privacy extends to sexual relations between husband and wife. Despite the philosophical differences of the majority in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), as to which constitutional provision encompasses the right to privacy, their agreement was complete as to the sanctity of the marital relationship. As stated by Mr. Justice Harlan, dissenting from a procedural dismissal in Poe v. Ullman, 367 U.S. 497, 552, 553, 81 S.Ct. 1752, 1782, 6 L. Ed.2d 989 (1961),

Of this whole "private realm of family life" it is difficult to imagine what is more private or intimate than a husband and wife's marital relations . . . .

. . . the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected. It is one thing when the State exerts its power either to forbid extra-marital sexuality altogether, or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy.

Va.Code Ann., § 18.1–212 regulates no less than the actual form of sexual expression between husband and wife. It invades the marital bed, informing the couple of the conduct in which they may or may not engage. As it applies to a married couple, this law doubtless threatens an invasion of the right of privacy.

Similarly, this Court has some doubt as to whether § 18.1–212 could constitutionally be applied to private sodomous acts between heterosexual consenting adults. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), in particular, casts doubt upon the legal viability of the marital-nonmarital distinction. In extending the rationale of *Griswold* to strike down a Massachusetts statute which prohibited the dissemination of contraceptive devices to unmarried persons, the Court declined to restrict the right of privacy in sexual matters to married couples:

Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. 405 U.S. at 453, 92 S.Ct. at 1038. See also, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of personal privacy extends to the decision by a woman whether to have an abortion); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (privacy protects possession of obscene material in one's home).

The Court concludes that the rationale expressed in *Eisenstadt* extends to protect the manner of sexual relations between unmarried persons. It is not marriage vows which make intimate and highly personal the sexual behavior of human beings. It is, instead, the nature of sexuality itself or something intensely private to the individual that calls forth constitutional protection. While the condition of marriage would doubtless make more difficult an attempt by government to justify an intrusion upon sexual behavior, this condition is not a prerequisite to the operation of the right of privacy. Accordingly, the statute also poses a threat to the right of privacy possessed by consenting adults.

On the facts of this case, however, the Court is not compelled to make the difficult determination of whether a compelling state interest underlies and justifies Va.Code Ann. § 18.1–212. Even if the statute could not constitutionally be applied to private sexual relations between consenting adults, the Court finds that the relations in this case were not private and concludes that the Lovisis have no right which they can assert. Their conduct was not constitutionally protected.

The phrase "right to privacy" may, unless carefully defined, be misconstrued. This is because privacy can refer either to seclusion or to that which is personal. To describe an act as private may mean that it is performed behind closed doors. It may also mean that the doing of that act is a decision personal to the one performing it and

having no effect on others. In the constitutional context, the meaning of privacy is doubtless closer to the latter than the former definition. This does not mean, however, that the United States Constitution guarantees to an individual the right to perform any act which he may choose to do so long as the performance of that act has no meaningful effect on others. Rather, the right to privacy extends to the performance of personal acts or decisions only within certain contexts. Among these protected areas are acts and decisions relating to child bearing, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), child rearing; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), marriage; Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1243, 22 L.Ed.2d 1010 (1967); and private reading within the home, Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

Also included among these protected areas, this Court concludes, are intimate sexual relations between consenting adults, carried out under secluded conditions. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). While the right to privacy does not always have a seclusion aspect to it, as, for example, in the securing of an abortion, it does under the rationale of the cases explicating the right have such an aspect when protecting sexual relations between consenting adults. In *Griswold,* for example, it was the spectre of governmental agents entering the boudoir that greatly influenced Mr. Justice Douglas, speaking for the majority. In Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Court in holding that one may possess obscene matter within one's home was persuaded not only by the right of a person to read what he pleases, but also by the private sanctity of the home.[2] The existence of seclusion in a sexual act, therefore, is a necessary prerequisite to that act's being protected from state regulation by the Constitution. Where that element has been relinquished by the parties in the performance of their sexual act, they have given up the Constitution's protection over the manner in which they choose to carry out that act.

■ The facts of this case indicate that the Lovisis did indeed relinquish the secluded aspect of their sexual relations. The Court does not reach this conclusion, as the respondent would argue, on the basis of Dunn's presence in the bedroom while Margaret Lovisi performed fellatio on her husband (or, in the case of Margaret's second conviction, the presence of her husband in the room while she performed fellatio on Dunn). It may be that Dunn, as a willing participant, was within the ambit of privacy protected by the Constitution. Nor does the Court reach this conclusion on the basis of evidence that Carolyn and Eugenia Acree were present in their parents' bedroom while the acts in question were taking place, though if the testimony of these girls had been uncontradicted, the Court would have no doubt that the seclusion of the Lovisis' acts would have been waived.[3] Instead, the Court

---

2. "Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." 394 U.S. at 565, 89 S.Ct. at 1248.

3. As noted previously, the Acree girls testified that they had been present throughout the sexual acts and had actually taken the photographs in question. They testified further that their stepfather, Aldo Lovisi, had ordered them to take the pictures. This testimony was directly contradicted by Aldo Lovisi at the hearing of July 27, 1973, and by Dunn and Margaret Lovisi in another trial. The girls' testimony was further impeached by the admission of Carolyn Acree that she would like to see the relationship of her mother and her stepfather broken apart (Tr. p. 80, Commonwealth v.

bases its conclusion on the fact that the Lovisis took photographs of their sexual acts and then allowed these photographs to fall into their children's hands.[4]

In order for their sexual relations to be constitutionally protected, the Lovisis had the responsibility of ensuring that the seclusion surrounding their acts was preserved. The burden is on the Lovisis to show that under the totality of the circumstances, privacy was not waived. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), holding that in the Fourth Amendment area, the voluntariness of a consent to search by one not in custody is to be determined by the totality of the circumstances.[5] By electing to photograph their sexual relations, thus creating the possibility that the intimacy of their acts would be destroyed by future viewing by others, the Lovisis took upon themselves an especially heavy burden to protect their privacy. They did not meet that burden, the Court concludes, because of their failure to deny other persons access to the photographs.

While the evidence does not reveal that the Acree girls were actually in possession of the photographs depicting the acts here prosecuted, it is clear that they had possession of another sexually oriented photograph. This suggests that snapshots taken by the Lovisis were not kept at home in such a way that the children would be denied access to them. This suspicion is confirmed by the testimony of the investigating officer who

stated that "thousands" of photographs were to be found all over the house. Although the officer could not recall whether the gun cabinet in which he found the pictures in question was locked at the time of his investigation, the only conclusion to be drawn from his testimony is that the photos were freely available throughout the house to whomever lived there. On the strength of this conclusion, the Court holds that the Lovisis did not meet the burden incumbent upon them to preserve the seclusion of their sexual acts. As such they relinquished their right to privacy in the performance of these acts, and they could lawfully be prosecuted for them.

The Court next turns to the issue of whether the Lovisis have standing to attack their conviction on the grounds that Va.Code Ann. § 18.1–212 is unconstitutionally overbroad because it could not be enforced against consenting adults committing sodomitic acts in private. The concept of standing has several aspects. It may refer to standing to sue, which concerns whether the individual is sufficiently affected by that which he assails to insure his adversariness in prosecuting his claim. Or, it may refer as it does here to standing to challenge a particular action or statute on particular grounds. The principal question surrounding this type of standing is whether the party seeking to challenge an action or statute alleges that it is his rights which have been violated or rather those of some other party.[6]

---

Margaret Lovisi) and that she would like for her mother and stepfather to go to prison so that she, Carolyn, and her sister might be returned to their natural father (Tr., p. 58, Commonwealth v. Aldo Lovisi).

4. At the plenary hearing, Aldo Lovisi testified that the photographs were stored in a locked gun cabinet. The Acree girls were instructed not to go into same, but according to Lovisi were never told of the existence of pictures. Nevertheless, Lovisi found that the locks had been tampered with and suspected that one of the girls may have broken in to view the pictures. Further, an argument between Lovisi and his stepdaughter led him to conclude that

she may have had knowledge of the acts which he claims were done privately. While Lovisi claims to have taken proper precautions, it is nevertheless clear that the girls knew of the sexual activities which occurred in his bedroom and possessed pictures of sexual acts.

5. Schneckloth held that the rule of knowing and voluntary waiver of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 has been applied only "to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." In the criminal prosecution context, Johnson shifts the burden to the government to prove waiver. However, the problem here

In United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), the United States Supreme Court restated the principle of constitutional adjudication concerning the latter sort of standing:

> One to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. *Id.* at 21, 80 S. Ct. at 522.

The Court noted, however, that there are certain exceptions to this general rule. In the area of first amendment freedoms, for example, parties whose conduct is not constitutionally protected may be able to attack a statute upon which they are charged or convicted because of the chilling effect which that law may have upon others whose acts are protected. *E. g.,* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093 (1940). In areas other than freedom of expression, a litigant may base his claim upon the rights of others when those rights will necessarily be affected by the outcome of the litigant's suit. *E. g.,* Eisenstadt v. Baird, 405 U. S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 510 (1965); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). The Court in *Raines* also recognized that a defendant in a criminal action might have standing to raise the rights of those who could not constitutionally be prosecuted under the statute where the vast majority of the intended applications of the statute are unconstitutional and when it could be fairly said that the statute was not intended to stand as valid in those few cases where it could be applied lawfully. *E. g.,* Butts v. Merchants & Miners Transportation Co., 230 U.S. 126, 33 S.Ct. 964, 57 L.Ed. 1422 (1913). Similarly, a litigant may raise third party rights where an attempt to sever the constitutional applications of a statute from its unconstitutional ones would require such a revision of its text that the statute no longer gives an intelligible warning of the conduct it prohibited. *E. g.,* United States v. Reeves, 92 U.S. 214, 23 L.Ed. 563 (1875).[7] The fact that the litigant seeking standing on the basis of another's rights is doing so in a petition for a writ of habeas corpus, as opposed to another sort of criminal or civil litigation, makes no difference. See Eisenstadt v. Baird, *supra,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349; United States ex rel Williams v. Zelker, 445 F.2d 451 (2d Cir. 1971).

In order for the Lovisis to have standing to assert the rights of consenting adults acting in private, they must show that their case fits within one of the exceptions noted above. This case clearly does not involve first amendment rights, nor do the Lovisis stand in such a relationship to consenting adults performing sodomitic acts in private that the outcome of their conviction will necessarily affect the rights of those third persons. Unlike the doctor in Griswold v. Connecticut, *supra,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, or even the advocate of contraceptives in Eisenstadt v.

is concerned with the broader question of waiver of a possible constitutional protection by virtue of a course of conduct and not with the waiver of rights associated with criminal prosecution.

6. *See generally,* Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 72 Yale L.J. 599 (1962).

7. One commentator has formulated these last two exceptions into the following principle:

> If a party against whom a statute is sought to be enforced can show preliminarily non-severability of application or that an attempt to sever would leave standing a statute that would be incapable of giving fair notice of its prohibitions, that party has standing to challenge the statute on the grounds that it infringes the rights of third parties coming within its application.

Sedler, *supra,* n. 6, at 608.

Baird, *supra*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, the Lovisis' acts did not have the purpose or effect of protecting the rights of third persons. More importantly, the Court sees no obstacle to prevent those who have preserved the privacy surrounding their acts from asserting those rights to attack Va.Code Ann. § 18.1–212.

The Court further concludes that the Lovisis have not established that the Virginia sodomy law is unconstitutional in so many of its applications that it could not have been intended by the Virginia legislature to be left standing to cover persons, such as the Lovisis, who have not preserved their privacy. Although the statute was clearly designed to cover all acts of sodomy, public and private, the Court cannot say that a prohibition against the application of the statute to private acts prevents it from applying in the "vast majority of its intended applications." United States v. Raines, *supra*, 362 U.S. at 23, 80 S.Ct. at 523. Furthermore, the statute continues to give adequate notice of its prohibitions after its unconstitutional applications are severed from it. It does not become so vague or ambiguous as to be violative of the due process clause of the fourteenth amendment. See Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

The Court must conclude, therefore, that this is a case falling within the usual rule that a party attacking a statute must demonstrate that his own, rather than another's rights . are adversely affected by the statute.[8] Accordingly, the Lovisis do not have standing to attack the constitutionality of the statute under which they were convicted.

An order in accordance with this memorandum will issue.

---

8. It should be noted that except in those cases involving freedom of expression or where the litigation involving the party charged will necessarily affect the rights of the third persons, courts have been very reluctant to find standing. *See, e. g.,* Reddy v. United States, 403 F.2d 26 (1st Cir. 1968) ; Douglas v. Beneficial Finance Co., 334 F.Supp. 1166 (D.Alaska 1971).