**James Lester POST Jr., Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–84–303.**

Court of Criminal Appeals of Oklahoma.

Feb. 26, 1986.

Rehearing Denied April 14, 1986.

Thomas Purcell, Asst. Public Defender, for appellant.

Michael C. Turpen, Atty. Gen., Robert W. Cole, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge:

The appellant, James Lester Post, Jr., was charged by Information in the District Court of Rogers County, Case No. CRF–83–17, for the offense of Rape, two counts of the Crime Against Nature, and Maiming, After Former Conviction of a Felony. A jury acquitted the appellant of Rape, but convicted him for the two counts of Crime Against Nature, and Maiming. The jury recommended a sentence of ten (10) years on each count of the Crime Against Nature, and fifteen (15) years imprisonment for Maiming. We reverse.

According to the testimony produced by the State, the alleged victim, H.C., went to the Red Eye Saloon in Claremore, Oklahoma on the morning of January 7, 1983. While at the saloon, she met the appellant, who invited her to his house to watch television and drink beer. H.C. accepted the appellant's invitation. The pair left the bar, purchased some beer at a nearby store, and went to appellant's home. When they arrived at the house, appellant allegedly demanded sex. H.C. claimed she was forced, at knife-point, to have sex with the

appellant. She also claimed appellant anally sodomized her and forced her to commit an act of fellatio. As appellant sexually assaulted her, he also repeatedly beat her and caused a severe injury to her eye, according to H.C.'s testimony. Finally, the appellant allowed H.C. to dress, and they left the house together. H.C. and the appellant eventually separated, and H.C. went to a friend's house and called her husband.

Dr. Raymond Townsend, an ophthalmologist, testified H.C. was blinded in the eye, which eventually was surgically removed. He also testified that H.C. had previously received eye surgery, which had rendered her eyes highly susceptible to injury. A forensic chemist testified that swabs taken during a rape examination of H.C. indicated the presence of sperm in the rectum.

Appellant testified that he met H.C. at the bar, and asked her to go to the house with him. He claimed all of the sexual acts, including anal intercourse and oral copulation, were voluntarily performed by H.C. After completing these sex acts, the appellant fell asleep. He awoke suddenly when he discovered H.C. going through his pants pockets. Appellant testified he believed H.C. was attempting to steal his money, and he struck her in anger several times, though he did not intend to injure her. He and H.C. then dressed and left the house together. After walking several blocks together, H.C. asked that appellant not accompany her any further, as she would not be able to explain his presence to her husband.

On his appeal to this Court, the appellant raises seven assignments of error challenging each of the convictions, and the sentences imposed.

### I.

We first deal with appellant's claim that his convictions for the Crime Against Nature, 21 O.S. 1981, § 886,[1] rest on an uncon-

1. 21 O.S.1981, § 886 defines the Crime Against Nature as follows:

Every person who is guilty of the detestable and abominable crime against nature, com-

stitutional basis. Appellant has asserted his claim on two grounds: First, he claims the statute is unconstitutionally vague. Second, he claims the statute, as applied to non-violent consensual activity between adults in private, violates his right to privacy under the United States Constitution. Because we agree with appellant's second claim, we need not address the first.

In this case, as noted above, the jury was presented with evidence alleging two entirely different scenarios. The prosecutrix, by and through the State, presented testimony that the appellant used threats and violence to rape, sodomize, and force her to commit an act of fellatio. The appellant, however, claimed the prosecutrix was a willing participant in the sexual activities which occurred on the day in question. He claimed the eye injury was inflicted after the sexual activities had ceased. Appellant was charged with two counts alleging commission of the Crime Against Nature, one count of Rape, and a count of Maiming. By its statutory language, the Crime Against Nature prohibits consensual, as well as nonconsensual, acts of unnatural copulation. *See Slaughterback v. State,* 594 P.2d 780 (Okl.Cr.1979). Accordingly, the jury was instructed that consensual intercourse would not constitute rape,[2] but no mention was made of consent as a factor in the Crime Against Nature. During its deliberations the jury sent a note asking the trial court whether the Crime Against Nature is "a crime with or without consent in the State of Oklahoma? [sic]". The trial court instructed the jury that "consent is not an element [of the Crime Against Nature], nor is the crime less of a crime if committed with a consenting person." The jury returned a verdict of guilty on both counts of the Crime Against Nature, but acquitted the appellant on the

Rape charge. Appellant alleges the convictions for the Crime Against Nature cannot be permitted to stand, as they are violative of his right to privacy. Although we previously rejected a similar claim in *Warner v. State,* 489 P.2d 526 (Okl.Cr.1971), we agree that more recent decisions of the United States Supreme Court lend support to appellant's view.

The right to privacy asserted by this appellant is not explicitly mentioned either in the text or amendments to the Federal Constitution; yet it has been called "the most comprehensive of rights and the right most valued by civilized man." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed.2d 944 (1928) (Brandeis, J., dissenting). This right, as we understand it, is the "right of independence in making certain kinds of important decisions, with a concomitant right to conduct oneself in accordance with those decisions, undeterred by governmental restraint..." *People v. Onofre,* 51 N.Y.2d 476, 485, 415 N.E.2d 936, 939, 434 N.Y.S.2d 947, 949 (1980). *Accord Lovisi v. Slayton,* 363 F.Supp. 620, 625–26 (E.D.Va.1973), *aff'd,* 539 F.2d 349 (4th Cir. 1976). The modern judicial conception of constitutional privacy originated in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In *Griswold,* the Supreme Court found the existence of an implicit constitutional right of privacy in the "penumbras" of various constitutional provisions. Writing for the Court, Justice Douglas declared "that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." *Id.* at 484, 85 S.Ct. at 1681. This implicit guarantee of privacy makes "fully meaningful" the express rights contained in the document.[3]

mitted with mankind or with a beast, is punishable by imprisonment in the penitentiary not exceeding ten (10) years.

We have determined that the Crime Against Nature includes unnatural sex acts including copulation per os between females [*Warner v. State,* 489 P.2d 526 (Okl.Cr.1971)], cunnilingus [*Clayton v. State,* 695 P.2d 3 (Okl.Cr.1984)], fellatio [*Ex Parte DeFord,* 14 Okl.Cr. 133, 168 P.

538 (1917)], and rectal coitus (copulation per anus) [*Berryman v. State,* 283 P.2d 558 (Okl.Cr. 1955)].

2. *See* 21 O.S.1981, §§ 1111, 1114.

3. More specifically, Justice Douglas stated that "[v]arious guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one ... [t]he

Justice Goldberg, joined by the Chief Justice and Justice Brennan, specially concurred "to emphasize the relevance of [the Ninth] Amendment to the Court's holding." [4] *Id.* at 487, 85 S.Ct. at 1683 (Goldberg, J., concurring).

When we first were faced with this issue of extramartial sexual privacy in *Warner v. State*, 489 P.2d 526, we were limited in consideration of Supreme Court cases to *Griswold v. Connecticut, supra. Griswold* held, based on the principles explained above, that the State could not constitutionally regulate the distribution of contraceptives to married persons. Certain language in the opinion indicated that this "right to privacy" was limited to decisions made, and acts committed, within the marital relationship. Justice Douglas had written:

> We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Id.* at 486, 85 S.Ct. at 1682. We accordingly held that "the United States Supreme Court, in the landmark case of *Griswold v. State of Connecticut, supra,* does not prohibit the state's regulation of sexual prom-

iscuity or misconduct between non-married persons." *Warner v. State*, 489 P.2d at 528.

We are now informed that "the outer limits" of the right to privacy "have not been marked by the Court." *Carey v. Population Servs Int.*, 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977). Indeed, *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) indicates to us that the constitutional right to privacy, which at first appeared to be family-based, affords protection to the decisions and actions of individuals outside the marriage union. *See also Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (right to abortion cannot be regulated absent a compelling state interest). In *Eisenstadt*, the Court banned, as unconstitutional, Massachusetts' regulation of contraceptives to single adults. Although the Court's holding was based primarily on equal protection grounds, the Court also relied on the right to privacy, and wrote:

> It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and a heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

---

Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of people, to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' " *Id.*

4. Justice Goldberg did not believe that "penumbras" were necessary in Constitutional analysis because the Court had previously held that:

> the Fourteenth Amendment absorbs and applies to the States those specifics of the first eight amendments which express fundamental personal rights. The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments.

*Id.* at 488, 85 S.Ct. at 1683–84.

*Id.* at 453, 92 S.Ct. at 1038. Nor can it be said that, through the *Eisenstadt* opinion, the right to privacy is merely extended to individual decisions regarding procreative choice. Such a statement would ignore the Supreme Court's reliance in *Eisenstadt* on its earlier opinion in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In *Stanley,* the Supreme Court held that an individual's right to view obscene material in the privacy of his or her home could not be regulated by the State. *Stanley* obviously did not deal with procreative choice within or without marriage, but instead extended the right of privacy to matters of sexual gratification. In addition to citing Stanley, the Court, in *Eisenstadt,* specifically set out the following quote from the *Stanley* opinion:

> "[A]lso fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.
>
> " 'The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions, and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man.' *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)."

*Eisenstadt v. Baird, supra* 405 U.S. at 453 n. 10, 92 S.Ct. at 1038 n. 10, quoting *Stanley v. Georgia, supra* 394 U.S. at 564, 89 S.Ct. at 1247.

■ For the above and foregoing reasons, we are compelled to hold that our decision in *Warner v. State, supra,* was based on the erroneous premise that the right to privacy is limited to decisions and acts arising in the marital relationship. It now appears to us that the right to privacy, as formulated by the Supreme Court, includes the right to select consensual adult sex partners. Exercise of this right cannot be proscribed by the State in the absense of a compelling justification. *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973). *See also Griswold v. Connecticut, supra* 381 U.S. at 497–498, 85 S.Ct. at 1688–1689 (Goldberg, J., concurring).

■ We recognize it is the opinion of many that abnormal sexual acts, even those involving consenting adults, are morally reprehensible. However, this natural repugnance does not create a compelling justification for state regulation of these activities. The Supreme Court has determined that merely because the purchase and use of contraceptives by unmarried persons would arouse moral indignation among broad segments of the community, or that the use of pornographic materials in the privacy of one's own home would invoke general displeasure, does not provide a compelling justification to regulate either activity. *See Eisenstadt v. Baird, supra,* and *Stanley v. Georgia, supra.* The State has failed to demonstrate that private, consensual acts between adult persons could significantly harm society so as to provide a compelling state interest in the regulation of such activities. The fact that twenty-two states have decriminalized private consensual sodomy between adults further illustrates that no harm to society is presently caused by these sexual acts. *See* Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States,* 30 Hastings L.J. 799, 950–951 (1979).

We stress that our decision today in no way affects the validity of 21 O.S. 1981, § 886 in its application to bestiality, forced sexual activity, sexual activity of the underaged, or public or commercial sexual acts. We do not reach the question of homosexuality since the application of the statute to such conduct is not an issue in this case. Our holding today is simply to

declare unconstitutional the application of section 886 to the facts of this case.

The convictions herein cannot stand under the principles announced in this opinion. Accordingly, we hold the judgment and sentence on each count of the Crime Against Nature must be reversed and remanded to the District Court for proceedings not inconsistent with this opinion.

## II.

Turning to the remaining count of Maiming, we find that it must be reversed as well. Appellant claims he was prejudiced when the trial court refused his requested instructions on the lesser included offenses of simple and aggravated assault and battery. He claims that instructions on these lesser offenses were justified by his testimony that he had no intention of injuring the prosecutrix, but simply lashed out when he awoke and found her trying to steal money from his pants.

We have previously held that both simple and aggravated assault and battery are lesser included offenses of maiming, and that, in appropriate cases, instructions as to these lesser offenses should be delivered to the jury. *Savage v. State*, 525 P.2d 1219 (Okl.Cr.1974). Our Legislature has defined assault as "any willful and unlawful attempt or offer with force or violence to do a corporal injury to another." 21 O.S. 1981, § 641. Battery is defined as "any willful and unlawful use of force or violence upon the person of another." 21 O.S. 1981, § 642. An assault and battery becomes aggravated "[w]hen great bodily injury is inflicted upon the person assaulted." 21 O.S. 1981, § 646 (1). Specific intent is not an element of aggravated assault and battery. *State v. Madden*, 562 P.2d 1177 (Okl.Cr.1977). The Legislature has defined Maiming as follows:

> Every person who, with premeditated design to injure another, inflicts upon his person any injury which disfigures his personal appearance or disables any member or organ of his body or seriously diminishes his physical vigor, is guilty of maiming.

21 O.S.1981, § 751. We have accordingly held that a disfiguring injury caused by another does not constitute Maiming unless done "with premeditated design to injure another," which requires a specific intent to inflict an injury, although not necessarily the very disfigurement actually perpetrated. *DeArman v. State*, 33 Okl.Cr. 79, 242 P. 783 (1926). *See also Boulding v. State*, 83 Okl.Cr. 352, 177 P.2d 152 (1947). *Accord* Perkins & Boyce, *Criminal Law*, 240 (3d Ed.1982). Without proof of specific intent to injure or disfigure, a charge of Maiming is reduced to aggravated assault and battery. *See Savage v. State, supra.*

■ In this case, although serious bodily injury resulted to this victim, the appellant maintained he intended to cause no injury. This claim was supported by the testimony of Dr. Townsend, who stated that in H.C.'s situation "any kind of blow would potentially break those sutures [from the previous eye surgery] and cause this kind of injury to have occurred."

We find the trial court erred in its failure to deliver the appellant's requested instruction on the lesser offense of aggravated assault and battery. It is clear that the appellant herein assaulted the victim with his fists, causing great bodily injury to the eye. We will accordingly reverse and remand for a new trial on the charge of maiming.

The judgment and sentences on each count are hereby REVERSED and REMANDED to the District Court for proceedings not inconsistent with this opinion.

BRETT, J. concurs.

BUSSEY, J., dissents.

BUSSEY, Judge, dissenting:

I must respectfully dissent. This Court has long recognized that consent is not an element of the crime against nature. See, 21 O.S.1981, § 886; *Canfield v. State*, 506 P.2d 987 (Okl.Cr.1973). *Slaughterback v. State*, 594 P.2d 780 (Okl.Cr.1979). Clearly,

it is a legislative function and not a judicial function to amend statutes if a change is to be enacted.

Additionally, I dissent to the reversal of the maiming conviction. Since the victim lost her eye as a result of the attack, the appellant's actions fall squarely within the provisions of 21 O.S.1981, § 751, and the trial court properly denied the appellant's proferred instructions on simple and aggravated assault and battery. Therefore, I am of the opinion that the judgments and sentences should be affirmed.