Michael Edward **NEWSOM**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–86–53.

Court of Criminal Appeals of Oklahoma.

Oct. 12, 1988.

Mark Barrett, Sp. Counsel, Oklahoma Appellate Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen., Susan Stewart Dickerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

The appellant, Michael Edward Newsom, was tried by jury and convicted of First Degree Rape (Count I) (21 O.S.Supp.1985, § 1114), First Degree Burglary (Count II) (21 O.S.1981, § 1431) and Sodomy, Crime against Nature (Count III) (21 O.S.1981, § 886), all After Former Conviction of Two Felonies (21 O.S.1981, § 51), in Comanche County District Court, Case No. CRF–85–41, before the Honorable William M. Roberts, District Judge. The jury set punishment at twenty-five (25) years on Count I, twenty (20) years on Count II, and twenty-five (25) years on Count III. Judgment and sentence was imposed accordingly.

The prosecutrix, S.S., and her husband, D.S., were living in a trailer park in Lawton, Oklahoma, on January 22, 1985. On that morning, D.S. got dressed for work and left around 7:00 a.m., leaving S.S. asleep. D.S. testified that when he left, a ceramic bowl on top of the refrigerator contained a ten dollar bill and his wallet,

containing a recent photograph of S.S., was laying beside the bowl. He also testified that an address book was on the refrigerator. Between 8:00 a.m. and 8:30 a.m., D.S. received a telephone call from his wife, who told him she had just been raped.

S.S. testified that on the morning of January 22, 1985, she remained in bed after her husband left for work. She was awakened when she felt a hand beside her. A naked man, wearing a stocking mask, was kneeling beside her bed. She screamed and he grabbed her, held a gun to her head and told her to shut up. He forced her to commit oral sodomy on him, then got into bed with her and forced her to have sexual intercourse. The man got out of bed and made her turn her head to the wall, while he rummaged about the trailer. He asked her if there was any money in the trailer, and she told him that if there was any money, it was in a ceramic bowl on the refrigerator. He left the bedroom and she heard him in the kitchen. When he returned, he was wearing a green army jacket and dark pants. He pulled the phone cord from the wall and told her to not to move for ten minutes. She remained in the bed for five minutes, then got up, went to the bathroom and washed herself. S.S. retrieved her pistol, and went to the kitchen. She saw John Bryan outside his trailer, motioned for him to come over and told him that she had just been raped by a man who was wearing an army jacket. She then called her husband at work. At trial, she testified she was unable to identify her assailant due to the stocking mask over his face, but that she was positive that he was a caucasian with a slight build.

John Bryan testified that he noticed a man in a green army jacket outside the gate of S.S.'s trailer. Within minutes, S.S. called him over to her trailer and told him she had been raped by a man in an army jacket. Bryan stated that the man he saw had a small build, blonde hair, prominent cheekbones, and "squinty" eyes. He also testified he only saw the man for a few seconds, but that appellant looked like the man. Testimony revealed that, on two different occasions, Bryan had been asked by the police to identify the man he saw outside S.S.'s trailer. Bryan first identified a man other than appellant, stating that the man "looked similar." At a second photographic lineup, Bryan identified appellant. At trial, Bryan admitted he was unable to recall certain details about the man.

Appellant, along with Kurt Peterson and David Churchill, lived in a trailer in the same trailer park as the victim and her husband. David Churchill testified that on the morning of January 22, 1985, he saw appellant as he was leaving for work around 8:10. Appellant was in the hallway of the trailer and was already dressed. He also testified that appellant did not pay rent, but did pay some of the bills. Churchill further explained that appellant allowed him to use appellant's car. A couple of days after the rape, Churchill was driving appellant's car and was arrested for driving while intoxicated. Appellant's car was impounded and a green army jacket, gloves and a stocking mask were found in the backseat. Upon finding these items, the police asked if they could search Churchill's trailer, and Churchill consented. D.S.'s wallet, S.S.'s address book and the picture of S.S. contained in the stolen wallet were found in the top drawer of appellant's dresser.

Appellant's other roommate, Kurt Peterson, testified that he and appellant went to Wichita Falls on the evening of January 22, 1985. During this trip, appellant told Peterson that he had raped a girl in the trailer park and had stolen some money. Peterson thought appellant was just kidding. Peterson further testified that on the morning of January 22, 1985, he awoke around 7:00 a.m., wandered through the trailer and found no one home. He went back to sleep on the couch and awoke around 8:30, at which time appellant was home and dressed. Peterson also stated that a gun found in the trailer belonged to his father and was in his coat pocket on January 22, 1985.

During trial, physical evidence was presented which included an analysis of the stains found on the bedsheets of S.S. This analysis revealed the presence of antigen B. Expert testimony disclosed that only a

person, who was a secretor, with blood type B, could secrete antigen B. After testing, it was determined that S.S. had blood type O and D.S. had blood type A. Appellant had blood type B, and was a secretor of antigen B. No hair samples found on the bedsheets were consistent with the hair of appellant, but were consistent with that of S.S. and D.S. Neither did the sperm samples obtained from S.S. reveal antigen B; however, these tests were inconclusive because S.S. had washed herself.

The defense consisted of the testimony of appellant and his girlfriend. Appellant admitted two former convictions for burglary. He also testified that Kurt Peterson was lying about the alleged comments made by him during the trip to Wichita Falls. He testified that he did not place the stolen articles in the drawer and had never seen S.S. before the preliminary hearing. Appellant's girlfriend testified that on January 24, 1985, she opened the drawer where the stolen articles were found and did not see any of the stolen articles.

As his first proposition of error, appellant urges that the trial court committed reversible error when Bryan's identification testimony was allowed into evidence. Appellant argues that this testimony was not sufficiently reliable to be considered by the jury since Bryan could not make a positive identification. In support of this allegation, appellant points out that Bryan was subjected to two photographic lineups, and that he misidentified appellant at the first of these. He further emphasizes the fact that Bryan testified he only saw the man in the green army jacket for a matter of seconds, and was not clear on the man's eye color or the color of his shoes. Before such testimony was presented to the jury, the trial judge held an *in camera* hearing to determine the admissibility of the identification testimony of Bryan. After thorough examination by both the State and defense counsel, the trial judge determined that the testimony was reliable and was not tainted by the pre-trial photographic lineups.

Appellant's contention of "inherent unreliability" goes more toward the credibility of Bryan's testimony than to its admissibility. While the jury is free to assess the credibility of any given testimony, the admissibility of evidence is within the sound discretion of the trial court. *See Lewis v. State,* 681 P.2d 772, 774 (Okla.Crim.App. 1984). Because identification testimony is evidentiary in nature, it rises to a constitutional level only when a conviction is based upon "a very substantial liklihood of irreparable misidentification." *United States v. Aigbevbolle,* 772 F.2d 652, 653 (10th Cir. 1985). In *Aigbevbolle,* the defendant did not allege impermissible suggestiveness in a pretrial lineup. Rather, he argued that identification testimony was inadmissible because the witness was unable to pick defendant's picture from a photographic lineup. The Tenth Circuit Court of Appeals held that this alone did not make the identification testimony inadmissible; instead, the witness' failure to identify the defendant on a prior occasion went to the credibility of the witness' testimony.

Similar to the case at bar is *Frick v. State,* 634 P.2d 738, 741–42 (Okla.Crim. App.1981), wherein a witness was allowed to testify to the identity of the defendant after having chosen two different photographs as "possible assailants." This Court, in holding that such testimony was admissible, pointed out that the pre-trial lineup did not taint the subsequent in-court identification and that the reliability of the identification was correctly determined during an *in camera* hearing in which both parties were allowed extensive rights of examination.

Application of the *Frick* rationale to the case at bar requires close scrutiny of Bryan's identification testimony. Important to this inquiry is the fact that Bryan testified that his identification of appellant was based on his recollection of the man he saw at S.S.'s gate, rather than on the photographs presented to him by the police. He was consistent in his description of the man he saw. He never proclaimed to have made a positive identification, but only stated that appellant looked like the man he

saw on the morning of January 22, 1985, while Kurt Peterson did not. The trial court considered all these factors, and determined the testimony was admissible. We agree that appellant's objection goes to the credibility of the witness' testimony rather than to its admissibility. Accordingly, Bryan's testimony was admissible. This assignment of error is without merit.

Appellant's second and third propositions involve his conviction for sodomy in violation of 21 O.S.1981, § 886. In these propositions, he argues that neither the Information nor the instructions alleged the element of force. He claims that *Post v. State*, 715 P.2d 1105 (Okla.Crim.App.1986), *cert. denied,* 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986), requires the State to prove force when the act of sodomy involves two adults of the opposite sex. Because force was not alleged in the Information, he asserts it was fatally defective. He further asserts that the instructions were fatally defective in that the jury was not informed that force was a required element of sodomy under 21 O.S.1981, § 886.

Before we may consider whether the Information and instructions were fatally defective, we must first determine if the State has the burden of alleging and proving force under 21 O.S.1981, § 886. In *Post*, this Court held that Section 886 was unconstitutional as applied to consenting, heterosexual adult acts; however, it was specifically limited to this particular sexual activity and did not affect the application of Section 886 to other sexual activity. *Id.* at 1109.

■ We do not agree with appellant that *Post* requires proof of force before an individual may be convicted of sodomy under Section 886. This Court cannot, through judicial invention, add an element to conduct which is proscribed by statute. However, we may review a statute to determine its constitutionality. *See Stafford v. State*, 665 P.2d 1205, 1210 (Okla.Crim.App.1983). Hence, the ruling in *Post* is limited to the determination that the statute is unconstitutional as applied to consensual, heterosexual acts between adults. *Post* does not

change the elements of the crime of sodomy as set forth in 21 O.S.1981, § 886. Thus, the State is not required to plead and prove an element of force under Section 886.

■ However, appellant is entitled to relief if his conduct fell within the boundaries protected by *Post.* To fall within the *Post* holding, appellant must show that the conduct for which he was convicted under Section 886 was a consensual, heterosexual act. In this case, appellant did not allege consent as a defense to the crime of sodomy; rather his sole defense was that of mistaken identity. Nowhere in the record is there any indication of consensual activity. The victim testified that she was forced to commit sodomy on the appellant. She stated that appellant was holding a gun to her head, and making threats as to what he would do if she did not obey his orders. Clearly, appellant's conduct does not fall within the protected perimeter of *Post.*

■ In his fourth and fifth assignments of error, appellant alleges that the Information and instructions given as to Count II, burglary, was insufficient because the State failed to allege with particularity the element of intent. The Information states as follows:

[T]hat said MICHAEL EDWARD NEWSOM did burglariously and feloniously break and enter into a certain mobile home occupied by and in the possession of [S.S.], by forcibly breaking open the front door of said mobile home and entering without the consent of said occupant, with the unlawful, felonious and burglarious intent then and there to commit a crime therein. . . .

While appellant agrees that intent was alleged, he urges that the language was insufficient because it failed to state the crime that appellant had the intent to commit. Citing *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), he claims that the "underlying crime" must be stated with particularity. Appellant did not object to the sufficiency of the Information during the preliminary hearing or trial.

We disagree with appellant's interpretation of *Presnell.* In that case, the Supreme Court reversed the ruling of the Georgia Supreme Court, which upheld a death sentence imposed by the jury, explaining that the jury relied on an underlying crime which was not set forth in the Georgia felony-murder statute as a crime for which a defendant could be convicted of first degree murder. *Id.* 99 S.Ct. at 236, n. 2. The Supreme Court concluded that the due process rights of the defendant had been violated because he was not sufficiently apprised of the crime with which he was charged. Unlike *Presnell,* appellant was not charged with a crime which relies on the commission of another crime. Instead, appellant was charged with burglary, which only requires the intent to commit a crime, not the actual commission of a crime.

An Information will be deemed sufficient if it states all the essential elements of the crime, thereby apprising the defendant of the crime which he is accused of committing. *Bruner v. State,* 612 P.2d 1375, 1380 (Okla.Crim.App.1980). The test for sufficiency of an Information is whether the defendant was actually misled by the Information and whether it would expose him to the possibility of subsequently being put in jeopardy a second time for the same offense. *Nealy v. State,* 636 P.2d 378, 380 (Okla.Crim.App.1981). Clearly, appellant was not misled by the Information filed against him in this case. This assignment of error is meritless.

Similarly, appellant asserts that instructions were deficient because they failed to require a finding of fact as to a particular crime which appellant intended to commit. Again, appellant failed to object to these instructions at trial or to submit additional instructions to the trial court. Hence, we may review only for fundamental error. *Hanson v. State,* 716 P.2d 688, 690 (Okla. Crim.App.1986). The instructions given, OUJI–CR 511 and 516, accurately defined the elements required by 21 O.S.1981, § 1431, and were not misleading or confusing. This assignment is also without merit.

Appellant's final assignment of error addresses the validity of Churchill's consent to search the trailer. Appellant alleges Churchill did not have the authority to consent to a search of appellant's bedroom. We disagree.

*United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974) stands for the proposition that consent given by one who possesses common authority or other sufficient relationship to the premises is valid as against one with whom authority is shared. This rationale has recently been followed by this Court in *Larson v. State,* 700 P.2d 220, 222 (Okla.Crim. App.1985). In that case, the defendant's roommate consented to a search of their apartment. During this search, incriminating evidence was found. The defendant objected to the introduction of the evidence, claiming the roommate's consent was invalid as against him. This Court disagreed, stating that "[p]ersons with joint access or control in a given area are vested with reciprocal or common authority to give consent to a search of the common premises." *Id.* at 222.

In the case at bar, the evidence presented at trial was that Churchill owned the trailer in which both he and appellant lived. Appellant helped with the bills, but did not pay a set amount of rent. Churchill kept some of his personal effects and clothing in the room in which appellant slept. Clearly, regardless of whether appellant was a guest or a resident of the trailer, both men had joint authority over the area searched. *Johnson v. State,* 731 P.2d 993, 1000 (Okla.Crim.App.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987); *Larson v. State,* 700 P.2d 220, 222 (Okla.Crim.App.1985); *Stucker v. State,* 493 P.2d 84, 89 (Okla.Crim.App.1972). Appellant's last assignment of error is without merit.

For the foregoing reasons, the judgment and sentences are AFFIRMED.

BUSSEY, J., concurs.

BRETT, P.J., concurs in result.