541 A.2d 183

**Steven Adam SCHOCHET**

v.

**STATE of Maryland.**

**No. 864, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

May 19, 1988.

Joseph Peter Suntum (Boyland & Thompson, Bethesda, and Alan H. Murrell, Public Defender of Baltimore, on the brief), for appellant.

Stephen J. Shapiro, Kathleen M. Boucher and Whiteford, Taylor & Preston, Baltimore, for amicus curiae American Civil Liberties Union of Maryland, Inc.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County, and Robert L. Dean, Asst. State's Atty. for Montgomery County, on the brief), Rockville, for appellee.

Argued before MOYLAN, WILNER and GARRITY, JJ.

MOYLAN, Judge.

The appellant, Steven Adam Schochet, was convicted by a Montgomery County jury, presided over by Judge Irma S. Raker, of an Unnatural and Perverted Sexual Practice (fellatio) prohibited by Md. Ann. Code, Art. 27, § 554. Upon this appeal, he raises three contentions:

1. That § 554 is unconstitutional as applied to private and noncommercial sexual acts between consenting heterosexual adults;

2. That Judge Raker impermissibly considered at sentencing both trial testimony and the victim impact statement concerning alleged offenses of which the appellant had been acquitted; and

3. That the imposition of a five-year sentence for this conviction constituted cruel and unusual punishment under the Eighth Amendment.

It is the first of these claims that commands our primary attention. We are called upon to determine the constitutionality, under the Federal Constitution, of a legislative act criminalizing certain forms of private, noncommercial sexual behavior between consenting, unmarried, heterosexual adults.

### How This Issue Arose

It took an unusual configuration of jury verdicts for this issue to arise. Eight charges were filed against the appellant, based upon three alleged sexual episodes. For an act of vaginal intercourse, the appellant was charged with rape, both in the first and second degrees. For acts of fellatio and anal intercourse, respectively, the appellant was charged with two separate sexual offenses, each involving counts for both first and second degrees. All six of those charges alleged greater or lesser force, as appropriate, and the lack of consent on the part of the victim. For the anal intercourse and the fellatio, respectively, the appellant was charged with violations of Art. 27, §§ 553 and 554. Neither of these charges required proof of force or absence of consent.

According to the State's witness, all three sexual acts were forced upon her by the appellant. The appellant acknowledged that both vaginal intercourse and fellatio took place but claimed that those acts were consensual. He denied that the anal intercourse ever took place. The verdicts strongly suggest that the jury did not believe the alleged victim's testimony beyond a reasonable doubt. The appellant was acquitted of all six charges involving force. He was also acquitted of the count charging anal inter-

course. He was convicted only of a violation of § 554, which charged an "unnatural and perverted sexual practice," in this case fellatio.

## The Appellant's Raising of the Issue

The appellant timely raised the issue of the constitutionality of § 554 as applied to consenting, unmarried, heterosexual adults. Prior to trial, he moved to dismiss the count on the ground that the statute is unconstitutional as applied to a private consensual act between heterosexual adults. Judge Raker denied the motion. At the close of the case, the appellant requested a jury instruction that consent would be a valid defense to a charge under § 554. On the basis of our holding in *Gooch v. State*, 34 Md.App. 331, 367 A.2d 90 (1976), Judge Raker declined to give the requested instruction.

## A Federal Constitutional Issue

The issue before us involves exclusively the Federal Constitution. The claim is that § 554 as applied to consenting adults violates the right to privacy, a recently articulated although unenumerated right under the Federal Constitution, which has been identified and developed in a series of Supreme Court decisions that we will discuss at some length. This is not an issue under the Maryland Constitution or Declaration of Rights. *Neville v. State*, 290 Md. 364, 372 n. 5, 430 A.2d 570 (1981); *Doe v. Commander, Wheaton Police Dep't*, 273 Md. 262, 329 A.2d 35 (1974); *Montgomery County v. Walsh*, 274 Md. 502, 336 A.2d 97 (1975).

## Appellate Standing

When a challenge is raised that a statute is unconstitutional because of overbreadth, courts traditionally decline to allow a litigant to assert a claim vicariously for others as to whom the application of the statute might be unconstitutional if the litigant himself is not a member of that possibly protected class.

The constitutional issue is that of whether there is some substantive due process right of privacy shielding from state regulation 1) noncommercial, 2) consensual, 3) private, and 4) adult sexual activity. Wherever one of those qualifying criteria is shown to be lacking, courts have regularly avoided the larger question by holding that the claimant lacks standing to vindicate the constitutional rights of others more favorably situated. If a defendant is shown to have engaged in a sexual act for hire, he is disentitled to litigate what the constitutional right might be if the sexual act had been noncommercial. *Cherry v. State*, 18 Md.App. 252, 264–266, 306 A.2d 634 (1973). If a defendant is shown to have engaged in a sexual act by force, he is disentitled to litigate what the constitutional right might be if the sexual act had been consensual. *Commonwealth v. Balthazar*, 366 Mass. 298, 318 N.E.2d 478 (1974). If a defendant is shown to have engaged in a sexual act in a public or even quasi-public place, he is disentitled to litigate what the constitutional right might be if the sexual act had been in private. *Neville v. State*, 290 Md. 364, 430 A.2d 570 (1981). If a defendant is shown to have engaged in a sexual act with a minor, he is disentitled to litigate what the constitutional right might be if the sexual act had been between two adults. *Hughes v. State*, 14 Md.App. 497, 287 A.2d 299 (1972).

These are but instances of the general principle discussed by the Supreme Court in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), which is applicable to claims that a statute is unconstitutional because of overbreadth. In addition to admonishing us that "application of the overbreadth doctrine in this manner is, manifestly, strong medicine," and that "it has been employed by the Court sparingly and only as a last resort," 413 U.S. at 613, 93 S.Ct. at 2916, the Court clearly stated the standing limitation:

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard

to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."

*Id.* at 610, 93 S.Ct. at 2915.

The appellant here was not disentitled to raise the issue in any regard. There is no suggestion that the act of fellatio in question was commercial, public, or involved a minor. In terms of its consensual quality, the evidence clearly permitted a finding that the act was consensual. The appellant is thereby entitled to a ruling on the constitutionality of the statute as applied to a private act between consenting, unmarried, heterosexual adults.

### The Classes of Persons Possibly Entitled to the Constitutional Right

■ When none of the impediments to standing is present, the claimant moves up to the plateau of the constitutional merits. At that level, the claimant will fall into one of three classes that may have constitutional significance: part of 1) a homosexual couple (male or female); 2) an unmarried heterosexual couple; or 3) a married heterosexual couple, in a roughly ascending hierarchy of favor. When, approximately twenty years ago, this new constitutional issue began to push for resolution, there were four possibilities. It could have been that all three classes would be determined to enjoy a constitutional right of privacy in their sex lives. It could have been that none of the three classes would be constitutionally shielded from the anti-sodomy laws. It could be that only married heterosexuals will enjoy a constitutional right of privacy in their sex lives, with the other two classes constitutionally bereft. It could be that only homosexuals will suffer the sting of the anti-sodomy laws, with the other two classes constitutionally protected.

One ambiguity has now been removed. It is now clear beyond room for disagreement that the Supreme Court has announced that there is no constitutional right of privacy to engage in homosexual acts. *Doe v. Commonwealth's At-*

*torney for City of Richmond,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976); *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). The issue in *Bowers v. Hardwick* was squarely posed:

"The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time. The case also calls for some judgment about the limits of the Court's role in carrying out its constitutional mandate."

478 U.S. at 190, 106 S.Ct. at 2843, 92 L.Ed.2d at 145. The Supreme Court held flatly that the Constitution conferred no such right. "[R]espondent would have us announce, as the Court of Appeals did, a fundamental right to engage in homosexual sodomy. This we are quite unwilling to do." 478 U.S. at 191, 106 S.Ct. at 2844, 92 L.Ed.2d at 146.

Our concern in this case, of course, is with unmarried heterosexuals. The case of married heterosexuals is not before us and we do not even speculate as to what the privacy implications might be for members of that class.

In the wake of *Bowers v. Hardwick,* we are left with two possibilities. It may be that the Supreme Court will ultimately determine that the decision to participate in unorthodox sexual activity is simply not a fundamental value, regardless of whether the participants are homosexual or heterosexual, married or unmarried. A number of the right to privacy cases, however, speak in such glowing terms of the sacrosanct intimacy of the marital union that the Supreme Court might determine that unorthodox sexual activity within marriage does enjoy a right to privacy. In that case, we would be called upon to determine whether unmarried heterosexuals are closer doctrinally to married heterosexuals, who would be protected, or unmarried homosexuals, who have already been determined not to be protected. We would have to determine whether the line that separates the protected class from the unprotected class was based upon the difference between heterosexuality and homosexu-

ality or upon the difference between marriage and non-marriage.

In either event, our starting point must be to examine the development of this unenumerated right to privacy and to see whether the Supreme Court has yet said anything that would suggest that our § 554 is unconstitutional as applied to unmarried heterosexuals.

### *The Scope of the Right to Privacy: Its Growth and Its Limitations*

As we undertake our reading of that case law, we are conscious that we are not writing on a clean slate. In the first place, we are not writing upon our own slate. We are not projecting meaning into the Maryland Constitution. We are attempting to forecast the probable content of the Federal Constitution.

We are writing on a slate, moreover, one-third of which has already been filled in by the Supreme Court. On the basis of that part of the constitutional picture already completed, we are called upon to make an honest prediction of what we think the remaining unfinished part of the picture will turn out to be.

It is not for us to make our own value judgment as to what we think the federal constitutional right to privacy *ought to be.* Our obligation, rather, is to read the multitudinous signs and indications the Supreme Court has provided and, from them, to make an intellectually neutral assessment of what we think the federal constitutional right actually *is* and *is not.*

Those multitudinous signs and indications are to be found in five major and four minor decisions of the Supreme Court. The minor decisions include a harbinger dissenting opinion in *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); two essentially tangential opinions in *Loving v. Virginia,* 381 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); and a summary disposition in

*Doe v. Commonwealth's Attorney for City of Richmond,*
425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976).

The essential body of Supreme Court law upon the right
to privacy, however, is in five decisions that range from
1965 through 1986.  They are *Griswold v. Connecticut,* 381
U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v.
Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972);
*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147
(1973); *Carey v. Population Services Int'l,* 431 U.S. 678, 97
S.Ct. 2010, 52 L.Ed.2d 675 (1977); and *Bowers v. Hardwick,*
478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).  The
scope of the right to privacy and the limitations upon the
right are to be found within that finite body of source
material.

Although the constitutional right to privacy was first
recognized in 1965, the harbinger appeared four years earli-
er in the dissenting opinion of Justice Harlan in *Poe v.
Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).
Before the Court was the same Connecticut statute, crimi-
nalizing the prescribing of any contraceptive drug or device,
that would be back before the Court four years later in
*Griswold v. Connecticut.*  On the first occasion, however, a
five-to-four majority decided that there was no justiciable
controversy and declined to reach the merits.  Judge Har-
lan's opinion, dissenting only on the issue of justiciability,
developed fully a theory of constitutional right to privacy
grounded firmly in the due process clause.  Justice Har-
lan's opinion was not only the first full exposition of the
right but it, in turn, was relied upon extensively by Justice
Goldberg's concurring opinion in *Griswold v. Connecticut,*
joined in by Chief Justice Warren and Justice Brennan.  It
was fully incorporated, moreover, into Justice Harlan's own
concurring opinion in *Griswold.*

In both the archetypal case of *Griswold v. Connecticut*
and its forerunner of *Poe v. Ullman,* the newly recognized
right to privacy was grounded solidly in the venerable
status of the institution of marriage.  Although subsequent
applications of the right would move outward from that

base, the hard core remained the sanctity of the marital union. The Harlan opinion in *Poe v. Ullman*, which is our starting point, stressed the intimacy of the marital relationship as the foundation of the protection:

> "I believe that a statute making it a criminal offense for *married couples* to use contraceptives is an intolerable and unjustifiable invasion of privacy in the conduct of the most intimate concerns of an individual's personal life." (Emphasis in original).

367 U.S. at 539, 81 S.Ct. at 1774 (Harlan, J., dissenting). Justice Harlan went on to characterize the nature of the intrusion by the State of Connecticut that made it unconstitutional:

> "[T]he State is asserting the right to enforce its moral judgment by intruding upon the most intimate details of the marital relation with the full power of the criminal law."

*Id.* at 548, 81 S.Ct. at 1779.

Four years later, *Griswold v. Connecticut* delivered what the *Poe v. Ullman* dissent had promised. Justice Douglas identified the institution of marriage as "a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." 381 U.S. at 485, 85 S.Ct. at 1682. The rock on which Justice Douglas erected the right to privacy was the institution of marriage:

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects."

*Id.* at 485–486, 85 S.Ct. at 1682.

Indeed, Justice Douglas cited, as support for this protection of the marital or family unit, two decisions from the heyday of the *Lochner v. New York* [198 U.S. 45, 25 S.Ct.

539, 49 L.Ed. 937 (1905)] era in which the Supreme Court used substantive due process to strike down state statutes that interfered not with the liberty of contract but with the liberty of the family unit to make parental decisions involving the education of the children. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

As Justice Douglas reached his rhetorical height in explaining why there must be a constitutional right to privacy, it is clear that in his reference to "the sacred precincts of marital bedrooms," the presence of the qualifying adjective "marital" was not inadvertent. We must remember that it was a bedroom, occupied by consenting adults, that was deemed to be without any constitutional right to privacy in *Bowers v. Hardwick.* The critical difference between the bedroom protected in *Griswold* and the bedroom not protected in *Bowers v. Hardwick* is that the former was a marital bedroom and the latter was not:

> "Would we allow the police to search the sacred precincts of *marital bedrooms* for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship." (Emphasis supplied).

381 U.S. at 485, 85 S.Ct. at 1682.

The concurring opinion of Justice Goldberg, joined by Chief Justice Warren and Justice Brennan, similarly left no doubt that the "concept of liberty" there being dealt with "embraces the right of marital privacy." 381 U.S. at 486, 85 S.Ct. at 1683. Justice Goldberg's concurrence relied heavily on the dissenting opinion of Justice Harlan in *Poe v. Ullman,* basing the newly recognized constitutional right on the sanctity of marriage:

> "I agree with Mr. Justice Harlan's statement in his dissenting opinion in *Poe v. Ullman,* ...: 'Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity

of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right.... Of this whole "private realm of family life" it is difficult to imagine what is more private or more intimate than a husband and wife's marital relations.'" (Citation omitted).

381 U.S. at 495, 85 S.Ct. at 1687–88. (Goldberg, J., concurring).

Justice White's concurring opinion was equally certain that the Connecticut anti-contraception statute was unconstitutional "as applied to married couples." 381 U.S. at 502, 85 S.Ct. at 1691 (White, J., concurring). Justice Harlan concurred "[f]or reasons stated at length in my dissenting opinion in *Poe v. Ullman.*" 381 U.S. at 500, 85 S.Ct. at 1690 (Harlan, J., concurring).

The importance for us of identifying the source of the right to privacy is clear. The holding of *Bowers v. Hardwick* that the homosexual plaintiffs there were not covered by the right to privacy is not, of course, dispositive of our decision with respect to the heterosexual appellant here. The *reason* behind that holding, however, might be determinative of the result we reach here. On the basis of *Griswold v. Connecticut* and *Poe v. Ullman,* the possibility arises that the reason the plaintiffs in *Bowers v. Hardwick* were barred from the coverage of the right to privacy was because their sexual intimacy lacked the unique imprimatur of the marital union, not because it lacked the quality of heterosexuality.

Two cases, decided shortly after *Griswold* and generally cited as examples of the developing constitutional right of privacy, are only tangential. *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), struck down a Virginia statute forbidding interracial marriage as a violation of the equal protection clause. The entire thrust of the opinion dealt with equal protection and *Griswold* was not even mentioned. Virtually as an afterthought, the concluding two paragraphs made the observation that the Virginia

statute also violated the due process clause. The only pertinent observation was, "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." 388 U.S. at 12, 87 S.Ct. at 1824. The right to privacy was still rooted in the protection of the institution of marriage.

*Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), struck down a Georgia anti-pornography statute to the extent that it criminalized the possession and enjoyment of pornography by an adult in the privacy of the home. The holding of the Supreme Court was based totally on the First Amendment's freedoms of speech and of the press, which were held to protect the right to receive information and ideas. The Court simply mentioned, in passing, that the First Amendment right took on an added dimension when it was exercised "in the privacy of a person's own home." 394 U.S. at 564, 89 S.Ct. at 1247. There was no analysis of a constitutional right to privacy. The total reference was as follows:

"Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—*that right takes on an added dimension.* For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." (Emphasis supplied).

*Id.*

In *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), the appellant attempted to expand the First Amendment protection of *Stanley v. Georgia* into a due process right of autonomy for consenting adults to enjoy pornography in a motion picture house. The argument was that the State of Georgia had not shown a substantial relationship between the social purpose sought to be served and the legislative means employed. The Supreme Court noted that the petitioners had urged that "absent such a demonstration, any kind of state regulation is 'impermissible.'" 413 U.S. at 60, 93 S.Ct. at 2636. In

rejecting any idea that the State had to make such a showing, the Supreme Court stated:

"We reject this argument. It is not for us to resolve empirical uncertainties underlying state legislation, *save in the exceptional case where that legislation plainly impinges upon rights protected by the Constitution itself.*[11]

[11] Mr. Justice Holmes stated in another context, that:

'[T]he proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.'"

(Emphasis supplied).

*Id.* The majority recognized the right to privacy as one of those "fundamental rights" to be found in the Constitution. It tightly narrowed its compass to a few select subjects, which did not include sexual relations of any sort by anyone outside of marriage:

"Our prior decisions recognizing a right to privacy guaranteed by the Fourteenth Amendment included 'only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty." ...' ... This privacy right encompasses and protects *the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing."* (Citations omitted) (Emphasis supplied).

*Id.* at 65, 93 S.Ct. at 2639.

The next major development was one that is pivotal to the appellant's argument here. The case was that of *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). It struck down as unconstitutional a Massachusetts statute that made it a crime to dispense contraceptive drugs or articles to unmarried persons. The possible punishment was five years. It has sometimes been argued, as the appellant argues here, that *Eisenstadt v. Baird* holds that whatever right of privacy was recognized for married couples in *Griswold* is to be extended broadly to unmarried

persons as well. The opinion, on careful reading, simply does not stand for that.

Although the particular inhibition on the married couple in *Griswold* had been one barring their receipt of information about contraception, the aura of sacrosanct status cast over the institution of marriage by the opinion was far broader than the mere right to receive information about contraception. The fact, therefore, that an unmarried person might be equally entitled to receive information about contraception by no means implies that the more sweeping intimations of *Griswold* would necessarily be extended as well. Indeed, the very language of *Eisenstadt v. Baird* relied upon by the appellant ties the extension of the right down to matters affecting "the decision whether to bear or beget a child":

> "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into *matters so fundamentally affecting a person as the decision whether to bear or beget a child.*" (Emphasis supplied).

405 U.S. at 453, 92 S.Ct. at 1038.

Even that limiting language must be handled cautiously. Justice Brennan's opinion for the Court spoke only for a plurality of four justices.[1] Even the plurality, moreover,

---

1. Justices Powell and Rehnquist, newly appointed to the Court, did not participate. Chief Justice Burger dissented.

   Justices White and Blackmun concurred only in the result and explicitly dissociated themselves from the opinion of the Court. They pointed out that the Massachusetts Supreme Judicial Court, in affirming the conviction, had relied solely on the fact the defendant Baird was not a physician, a necessary precondition to distribute a contraceptive device to anyone, married or single. In shifting the focus from the distributor of the contraceptive device to the distributee, the federal Court of Appeals described the recipient of the device as "an unmarried adult woman." Justices White and Blackmun pointed out that there was nothing in the record about her marital status, one way or the other. Had she been married, that would have been, under the Court of Appeals rationale, a complete defense to the distribution under the statute. The two justices reasoned that Massachusetts, therefore, had failed to prove a necessary element of its case. That

explicitly declined to hold that *Griswold*'s right to privacy was involved. They decided the case, rather, on the basis of the equal protection clause:

> "[I]f we were to conclude that the Massachusetts statute impinges upon fundamental freedoms under *Griswold,* the statutory classification would have to be not merely rationally related to a valid public purpose but necessary to the achievement of a compelling state interest.... But ... *we do not have to address the statute's validity under that test* because the law fails to satisfy even the more lenient equal protection standard." (Citations omitted) (Emphasis supplied).

405 U.S. at 447 n. 7, 92 S.Ct. at 1035 n. 7.

The plurality opinion first explored the possible purpose of the statute. For a number of reasons, not here pertinent, it concluded that no public health purpose was involved. It then explored the possibility that the purpose of the statute was to deter premarital sexual relations. An earlier Massachusetts decision had, indeed, held that the statutory purpose was to promote good morals through "regulating the private sexual lives of single persons." *Sturgis v. Attorney General,* 358 Mass. 37, 260 N.E.2d 687 (1970). The Supreme Court opinion conceded that, *if the deterrence of premarital sex were the purpose,* the statute would not offend the equal protection clause (or, presumably, the due process clause either). It went on to conclude, however, that the deterrence of premarital sex was not the purpose of the statute:

> "Conceding that the State could, consistently with the Equal Protection Clause, regard the problems of extra-

---

was a sufficient reason for Justices White and Blackmun to reverse the conviction and they declined, therefore, to consider any other constitutional issue.

Justice Douglas, who joined the plurality opinion but concurred separately, would have rested the decision on First Amendment grounds. He argued that handing a representative sample to a member of the audience at the conclusion of a lecture was no more than a visual or demonstrative aid to the lecture itself.

marital and premarital sexual relations as '[e]vils ... of different dimensions and proportions, requiring different remedies,' ... we cannot agree that the deterrence of premarital sex may reasonably be regarded as the purpose of the Massachusetts law." (Citation omitted).

405 U.S. at 448, 92 S.Ct. at 1035. Five reasons persuaded the plurality that the Massachusetts statute was not directed toward the deterrence of premarital sex: 1) It did not believe that Massachusetts would rationally "prescribe ... pregnancy and the birth of an unwanted child as punishment for fornication, which is a misdemeanor." *Id.* 2) It believed that banning the distribution of contraceptives had "at best a marginal relation" to the objective of deterring sex before marriage. 3) It concluded that the means were clearly inefficacious to the achievement of the end in that contraceptive devices were readily available to married and unmarried persons alike to prevent the spread of disease; they were simply not available for contraceptive purposes. 4) It found highly dubious the fact that no inquiry was made into the uses to which married persons would put the contraceptive devices:

> "[I]n making contraceptives available to married persons without regard to their intended use, does Massachusetts attempt to deter married persons from engaging in illicit sexual relations with unmarried persons. Even on the assumption that the fear of pregnancy operates as a deterrent to fornication, the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim."

*Id.* at 449, 92 S.Ct. at 1036. 5) Since the consummated crime of fornication carried only a thirty dollar fine or three months in jail, it would be bizarrely disproportionate to punish the mere aider or abettor, who but furnished the contraceptive device, potentially to twenty times the maximum punishment available for the principal offender. For all of those reasons, the opinion concluded that the deterrence of premarital sex was not the legislative aim.

The opinion found that the legislative purpose, rather, was to treat contraception, *per se,* as immoral and to inhibit it. Under that rationale, Massachusetts "could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons. In each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious." *Id.* at 454, 92 S.Ct. at 1038. It was in this context that the plurality opinion held:

"[W]hatever the rights of the individual to access to contraceptives may be, the rights must be the same for the unmarried and the married alike."

*Id.* at 453, 92 S.Ct. at 1038.

The significance of the *Eisenstadt v. Baird* decision has been explained by Comment, *Survey on the Constitutional Right to Privacy in the Context of Homosexual Activity,* 40 U.Miami L.Rev. 521 (1986):

"[A]lthough the state could prohibit sexual activity among unmarried individuals, the state could not indirectly restrain procreative choices." (Footnotes omitted).

*Id.* at 573. The Comment went on to note carefully that the *Eisenstadt* decision was based "on individual choice, but the individual choice at issue was procreational—not sexual." *Id.* at 574. The Comment concluded:

"Within the marital context of *Griswold, Eisenstadt* merely held that individuals may have equal access to contraceptives, and *not that transient, consensual, sexual intimacy is protected by the right of privacy.*" (Footnote omitted) (Emphasis supplied).

*Id.*

Because isolated phrases from *Eisenstadt v. Baird* are frequently lifted out of context, it is important to get a careful handle on precisely what *Eisenstadt v. Baird* has held.[2] It is not primarily a due process case at all, although

---

2. This overreading has been noted by Comment, *The Constitutionality of Sodomy Statutes,* 45 Fordham L.Rev. 553, 575–576 (1976):

"These words have been interpreted as affirming a general right of privacy covering sexual conduct, irrespective of whether the parties

it does stand for the proposition that the decision of whether to beget a child is part of the fundamental right to privacy and that any statute abridging it must be in furtherance of a compelling state interest. *Eisenstadt v. Baird* is primarily an equal protection case. It strongly suggests that if the purpose of the law were to discourage sexual relations outside of marriage, a legislative discrimination between married persons and unmarried persons would be a rational one and would not offend the equal protection clause. If, on the other hand, the purpose of the statute were to discourage contraception, *per se*, then it would be irrational for the Legislature to decide that an unmarried woman had less of an interest in avoiding pregnancy than a married woman might have. Such an irrational discrimination would offend the equal protection clause.

That reading of *Eisenstadt v. Baird* does not remotely help the appellant here, who claims a right to engage in unmarried sodomy, not a right to use contraception to avoid unwanted pregnancy.

The most sweeping application of the newly recognized right of privacy came eight years after its first recognition. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), held that a woman (in that case an unmarried woman) had, as an aspect of the right of privacy, the constitutional right to choose whether to continue or to abort a pregnancy. The *Roe v. Wade* opinion sheds little additional light on the issue before us. After tracing the development of the right of privacy, it catalogued those areas to which the right had been extended. Autonomy in the matter of sexual behavior (except implicitly within the

---

are married. On the other hand, a more faithful reading of the Court's statement in *Baird* would indicate that the right referred to was the freedom to decide whether or not to have children. Indeed, in a later decision the Court confirmed this interpretation. Accordingly *Baird* did not recognize any broad right of privacy protecting sexual intimacies." (Footnotes omitted).

An analysis of the *Baird* Court's logic can also be found in Note, *Legislative Purpose, Rationality, and Equal Protection*, 82 Yale L.J. 123, 124–127 (1972).

intimacy of the marital union) was not remotely one of them:

> "These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' ... are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage ...; procreation ...; contraception ...; family relationships ...; and child rearing and education." (Citations omitted).

410 U.S. at 152–153, 93 S.Ct. at 726.

The next development came four years after *Roe v. Wade*. *Carey v. Population Services Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), held simply that the combination of *Griswold* and *Eisenstadt v. Baird* guaranteed access by adults to contraceptives and that a New York law forbidding anyone but a licensed pharmacist to distribute contraceptives was an unconstitutional infringement on that right. Referring to *Griswold* and *Eisenstadt v. Baird*, the Court summarized their combined effect:

> "[T]he underlying premise of those decisions [is] that the Constitution protects 'the right of the individual ... to be free from unwarranted governmental intrusion into ... *the decision whether to bear or beget a child.*' " (Emphasis supplied).

431 U.S. at 687, 97 S.Ct. at 2017. Although *Griswold* spoke of "marital bedrooms," *Carey* reasoned, "subsequent decisions have made clear that the constitutional protection of individual autonomy *in matters of childbearing* is not dependent on that element." (Emphasis supplied). *Id. Eisenstadt v. Baird*, extending constitutional protection in that regard to unmarried persons, "characterized the protected right as the 'decision whether to bear or beget a child.' " *Id.*

Far from creating a wide-ranging right of autonomy in matters of sexual behavior generally, the statement of the right is a narrow one:

"Read in light of its progeny, the teaching of *Griswold* is that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State."

*Id.*

The Supreme Court began mapping out the line beyond which the constitutional right of privacy would not reach, in *Doe v. Commonwealth's Attorney for City of Richmond,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). That was a summary affirmance, without opinion, of a decision by a three-judge panel of the United States District Court for the Eastern District of Virginia in *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (1975). For the precedential significance of a summary affirmance, *see Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). *And see Carey v. Population Services Int'l,* 431 U.S. 678, 718 n. 2, 97 S.Ct. 2010, 2014 n. 2, 52 L.Ed.2d 675, 705 n. 2 (1977) (Rehnquist, J., dissenting). Although an affirmance of the decision of the District Court does not necessarily imply the adoption of all of the District Court's reasoning, the opinion by Senior Circuit Judge Bryan is of persuasive interest.

The Virginia statute there under review combined those actions proscribed in Maryland both by the common law crime of sodomy and by Art. 27, § 554. The Code of Virginia, 1950, as amended, provided:

"§ 18.1–212. Crimes against nature.—If any person shall carnally know in any manner any brute animal, or carnally know any male or female person by the anus or by or with the mouth, or voluntarily submit to such carnal knowledge, he or she shall be guilty of a felony and shall be confined in the penitentiary not less than one year nor more than three years."

The plaintiffs sought a declaratory judgment declaring the Virginia statute unconstitutional as applied to homosexual relations between consenting adult males in private. The District Court traced the development of the constitu-

tional right to privacy and pointed out that it was something that had been erected around marriage, the sanctity of the home, and the nurture of family life. The homosexual plaintiffs there simply did not qualify under those guidelines:

"Precedents cited to us as *contra* rest exclusively on the precept that the Constitution condemns State legislation that trespasses upon the privacy of the incidents of marriage, upon the sanctity of the home, or upon the nurture of family life. This and only this concern has been the justification for nullification of State regulation in this area."

403 F.Supp. at 1200.

The District Court concluded that there was "no authoritative judicial bar to the proscription of homosexuality—since it is obviously no portion of marriage, home or family life." *Id.* at 1202.

The District Court opinion reasoned that this entire subject matter is more appropriate for the legislative branch than for the judicial:

"If a State determines that punishment therefor, even when committed in the home, is appropriate in the promotion of morality and decency, it is not for the courts to say that the State is not free to do so.... In short, it is an inquiry addressable only to the State's Legislature." (Citations omitted).

*Id.* The opinion finally found that the longevity of the law testified to its legitimacy:

"Although a questionable law is not removed from question by the lapse of any prescriptive period, the longevity of the Virginia statute does testify to the State's interest and its legitimacy. It is not an upstart notion; it has ancestry going back to Judaic and Christian law. The immediate parentage may be readily traced to the Code of Virginia of 1792. All the while the law has been kept alive, as evidenced by periodic amendments, the

last in the 1968 Acts of the General Assembly of Virginia." (Footnotes omitted).

*Id.* at 1202–1203. That was the decision which the Supreme Court summarily affirmed.

What was strongly suggested by *Doe v. Commonwealth's Attorney* was explicitly stated by *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Involved was a Georgia anti-sodomy statute that paralleled almost exactly the Virginia anti-sodomy statute under review in *Doe v. Commonwealth's Attorney*. A declaratory judgment was sought that would declare the statute unconstitutional as applied to consenting adult male homosexuals in the privacy of the home. The United States Court of Appeals for the Eleventh Circuit granted the declaratory judgment, relying on the right to privacy developed in *Griswold, Eisenstadt v. Baird, Stanley v. Georgia,* and *Roe v. Wade.* 760 F.2d 1202 (11th Cir.1985). The Supreme Court reversed the Eleventh Circuit. The question to be considered was:

> "The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time. The case also calls for some judgment about the limits of the Court's role in carrying out its constitutional mandate."

478 U.S. at 190, 106 S.Ct. at 2843, 92 L.Ed.2d at 145. The applicability of the anti-sodomy law to heterosexuals, married or unmarried, was not considered by the Court:

> "The only claim properly before the Court, therefore, is Hardwick's challenge to the Georgia statute as applied to consensual homosexual sodomy. We express no opinion on the constitutionality of the Georgia statute as applied to other acts of sodomy."

*Id.* 478 U.S. at 188 n. 2, 106 S.Ct. at 2842 n. 2, 92 L.Ed.2d at 144 n. 2.

The reasoning of the Court, as to why *Griswold*'s right to privacy would not apply to homosexual couples, however, would apply, point by point, with indistinguishable validity at least as far as unmarried heterosexuals are concerned. The failure of homosexuals to qualify for constitutional protection certainly did not seem to be based upon any moral value judgment in favor of heterosexuality over homosexuality. The decision either exempted everyone from coverage or, at most, was based upon the limited coverage of the right to privacy, which would appear to embrace sexual intimacy within marriage but not outside of marriage, regardless of whether the extramarital intimacy were heterosexual or homosexual. The Court catalogued the limited subject matter covered by the right to privacy, a catalogue that would seem to have no more place for unmarried heterosexuals than for homosexuals:

"We first register our disagreement with the Court of Appeals and with respondent that the Court's prior cases have construed the Constitution to confer a right of privacy that extends to homosexual sodomy and for all intents and purposes have decided this case. The reach of this line of cases was sketched in *Carey v. Population Services International....* *Pierce v. Society of Sisters* ... and *Meyer v. Nebraska* ... were described as dealing with child rearing and education; *Prince v. Massachusetts* [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ] ... with family relationships; *Skinner v. Oklahoma ex rel. Williamson* [316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ], ... with procreation; *Loving v. Virginia,* ... with marriage; *Griswold v. Connecticut, supra,* and *Eisenstadt v. Baird, supra,* with contraception; and *Roe v. Wade,* ... with abortion. The latter three cases were interpreted as construing the Due Process Clause of the Fourteenth Amendment to confer a fundamental individual right to decide whether or not to beget or bear a child. *Carey v. Population Services International.*" (Citations omitted).

*Id.* 478 U.S. at 190–91, 106 S.Ct. at 2843–44, 92 L.Ed.2d at 145–146. The Court pointed out that none of those situations "bears any resemblance" to homosexual acts of sodomy. Neither, we note, do those situations "bear any resemblance" to unmarried heterosexual acts of sodomy:

> "Accepting the decisions in these cases and the above description of them, we think it evident that none of the rights announced in those cases bears any resemblance to the claimed constitutional right of homosexuals to engage in acts of sodomy that is asserted in this case. No connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated, either by the Court of Appeals or by respondent."

*Id.* 478 U.S. at 190–91, 106 S.Ct. at 2844, 92 L.Ed.2d at 146.

The Court went on to reject any more general claim that "any kind of private sexual conduct between consenting adults" is constitutionally protected. It cited the disclaimer, twice repeated, in *Carey v. Population Services Int'l* that adult sexual relations of any kind, heterosexual or homosexual, were constitutionally protected:

> "Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable. Indeed, the Court's opinion in *Carey* twice asserted that the privacy right, which the *Griswold* line of cases found to be one of the protections provided by the Due Process Clause, did not reach so far. 431 U.S., at 688, n. 5, 694, n. 17, 97 S.Ct. 2010 [at 2018 n. 5, 2021, n. 17], 52 L.Ed.2d 675."

*Id.*

In dissent, Justice Stevens, although ruing the result, insisted that the majority's rationale unquestionably covered heterosexuals as well as homosexuals:

> "[T]he rationale of the Court's opinion applies equally to the prohibited conduct regardless of whether the parties who engage in it are married or unmarried, or are of the same or different sexes." (Footnote omitted).

*Id.* 478 U.S. at 214, 106 S.Ct. at 2856, 92 L.Ed.2d at 161 (Stevens, J., dissenting).

The most painstaking scrutiny of every word the Supreme Court has written on the subject of the constitutional right to privacy does not yield any evidence that that right covers the type of activity before us in this case. That right covers the intimacy of the marital union; parental decisions dealing with raising and educating children; and decisions dealing with procreation, contraception, and abortion. There is not the remotest allusion to any constitutional protection for sexual activity—orthodox or unorthodox, heterosexual or homosexual—at least outside of marriage. Before we overturn a presumptively valid legislative action on the ground that it violates an ostensible constitutional protection, there must be some affirmative evidence that such a constitutional protection exists. We have found none.

### Explicit Disclaimers of Coverage

If the total absence of any affirmative evidence for the existence of such a right were not foreclosing enough, there have been numerous and repeated disclaimers by many of the justices of the Supreme Court with respect to any coverage of sexual activity, at least of a non-marital variety.

In his dissenting opinion in *Poe v. Ullman,* Justice Harlan, while recognizing the right to privacy as the constitutional shield that keeps the marital union inviolate from governmental intrusion, placed his imprimatur upon laws forbidding adultery, fornication, and homosexual practices:

"The laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up, as well as laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis."

367 U.S. at 546, 81 S.Ct. at 1778 (Harlan, J., dissenting). Indeed, the heart of his opinion was the contrast between the sacrosanct marital relationship and other sexual intimacies which the State was at liberty to forbid:

> "Adultery, homosexuality and the like are sexual intimacies which the State forbids altogether, but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage.... It is one thing when the State exerts its power either to forbid extra-marital sexuality altogether, or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy."

*Id.* at 553, 81 S.Ct. at 1782.

In *Griswold v. Connecticut,* the concurring opinion of Justice Goldberg, joined by Chief Justice Warren and Justice Brennan, was equally emphatic that the newly recognized constitutional right to privacy in no way cast doubt upon the legitimacy of laws against adultery, fornication, or sexual promiscuity and misconduct:

> "The State of Connecticut does have statutes, *the constitutionality of which is beyond doubt,* which prohibit adultery and fornication.... These statutes demonstrate that means for achieving the same basic purpose of protecting marital fidelity are available to Connecticut without the need to 'invade the area of protected freedoms.' ...

> Finally, it should be said of the Court's holding today that it in no way interferes with *a State's proper regulation of sexual promiscuity or misconduct."* (Citations omitted) (Emphasis supplied).

381 U.S. at 498–499, 85 S.Ct. at 1689 (Goldberg, J., concurring). The concurring opinion then quoted with approval that part of Justice Harlan's *Poe v. Ullman* dissent which explicitly exempted from the constitutional protection, both adultery and homosexuality.

Justice White's concurring opinion found the Connecticut anti-contraception statute to be unconstitutional "as applied to married couples," but acknowledged the legitimacy of laws regulating sexual behavior outside of marriage:

"[T]he statute is said to serve the State's policy against all forms of promiscuous or illicit sexual relationships, be they premarital or extramarital, *concededly a permissible and legitimate legislative goal.*" (Emphasis supplied).

381 U.S. at 505, 85 S.Ct. at 1693 (White, J., concurring). Justice Harlan concurred that the Connecticut statute was an unconstitutional infringement of the right to privacy "[f]or reasons stated at length in my dissenting opinion in *Poe v. Ullman.*" 381 U.S. at 500, 85 S.Ct. at 1690 (Harlan, J., concurring).

In *Eisenstadt v. Baird,* the Supreme Court found that the purpose of the Massachusetts anti-contraception law before it was to inhibit contraception as contraception. In terms of that purpose, it found the Massachusetts distinction between married persons and unmarried persons to be an invidious discrimination within the contemplation of the equal protection clause. The plurality opinion of Justice Brennan, joined by Justices Douglas, Stewart, and Marshall, held that *if the deterrence of pre-marital sex had been the purpose of the statute,* the statute would not have offended the equal protection clause (or, presumably, the due process clause either):

"Conceding that the State could, consistently with the Equal Protection Clause, regard the problems of extramarital and premarital sexual relations as '[e]vils . . . of different dimensions and proportions, requiring different remedies,' . . . we cannot agree that the deterrence of premarital sex may reasonably be regarded as the purpose of the Massachusetts law." (Citation omitted).

405 U.S. at 448, 92 S.Ct. at 1035.

Even with respect to orthodox sexual behavior (vaginal intercourse), the Supreme Court in *Carey v. Population*

*Services Int'l,* explicitly disclaimed any suggestion that it had been brought within the coverage of the constitutional right to privacy. The opinion for the Court of Justice Brennan, joined in this regard by Justices Stewart, Marshall, and Blackmun, stated:

> *"[W]e do not hold that state regulation must meet this [the compelling state interest] standard 'whenever it implicates sexual freedom,'* ... *or 'affect[s] adult sexual relations,'* ... but only when it 'burden[s] an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision.' "   (Citations omitted). (Emphasis supplied).

431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5. As to the significance of this note, *see Neville v. State,* 290 Md. 364, 374 n. 7, 430 A.2d 570 (1981).

As Justice White emphasized in his concurring opinion, the Supreme Court has not cast the net of constitutional protection even over orthodox sexual relations outside of marriage, let alone over acts of homosexual or heterosexual sodomy:

> "I do not regard the opinion, however, as declaring unconstitutional any state law forbidding extramarital sexual relations. On this assumption I join Part III.
>
> ... Again, however, the legality of state laws forbidding premarital intercourse is not at issue here."

431 U.S. at 702, 97 S.Ct. at 2025 (White, J., concurring). The concurring opinion of Justice Powell emphasized that an extension of the right to privacy "to all personal decisions in matters of sex is neither required by the Constitution nor supported by our prior decisions." 431 U.S. at 703, 97 S.Ct. at 2026 (Powell, J., concurring). In dissent, moreover, Justice Rehnquist stated unequivocally:

> "While we have not ruled on every conceivable regulation affecting such conduct the facial constitutional validity of criminal statutes prohibiting certain consensual acts has been 'definitively' established."

431 U.S. at 718 n. 2, 97 S.Ct. at 2033 n. 2 (Rehnquist, J., dissenting).

The argument, made by the appellant here, that the Supreme Court has created or recognized a constitutional right of privacy for consensual, adult, heterosexual fellatio simply cannot stand against these explicit and repeated disclaimers of ever having done any such thing.

Although all of the above disclaimers were by way of *dicta,* nine such disclaimers, subscribed to by no less than eleven Supreme Court justices, represent abundant circumstantial evidence of Supreme Court thinking on the subject. Added to that, of course, have been the square holdings in *Doe v. Commonwealth's Attorney for City of Richmond* (representing the vote of six justices; three others would have noted probable jurisdiction and set the case for oral argument) and *Bowers v. Hardwick.* Both of those decisions held that the Constitutional right to privacy did not extend to adult, consensual homosexual acts even in the privacy of the bedroom. *Bowers v. Hardwick,* moreover, cited the disclaimer, twice repeated, in *Carey v. Population Services Int'l,* that adult sexual relations of any kind, heterosexual or homosexual, were constitutionally protected:

> "Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable. Indeed, the Court's opinion in *Carey* twice asserted that the privacy right, which the *Griswold* line of cases found to be one of the protections provided by the Due Process Clause, did not reach so far. 431 U.S., at 688, n. 5, 694, n. 17, 97 S.Ct. 2010 [at 2018 n. 5, 2021, n. 7], 52 L.Ed.2d 675."

478 U.S. at 191, 106 S.Ct. at 2844, 92 L.Ed.2d at 146.

Indeed, the final statement by the Supreme Court in *Bowers v. Hardwick* would seem to sustain anti-sodomy laws generally. The Supreme Court held that legislative regulation of sexual behavior based upon the legislature's

reading of the prevailing morality of its electorate would pass the "rational basis" test of constitutionality:

"[R]espondent asserts that there must be a rational basis for the law and that there is none in this case other than the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable. This is said to be an inadequate rationale to support the law. The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed. Even respondent makes no such claim, but insists that majority sentiments about the morality of homosexuality should be declared inadequate. We do not agree, and are unpersuaded that the sodomy laws of some 25 States should be invalidated on this basis." (Footnote omitted).

478 U.S. at 196, 106 S.Ct. at 2846, 92 L.Ed.2d at 149. The sodomy laws of those 25 states referred to make no distinction between homosexual sodomy and heterosexual sodomy. Maryland, moreover, is one of those 25 states.

There is a real question as to whether the statements made by the Supreme Court about the almost sacrosanct intimacy of the marital union might compel a holding that there is a constitutional right to privacy with respect to any sexual activity engaged in by a married couple. There has, of course, never been a holding in that regard and that issue is not before us in this case.

There is no indication that the Supreme Court has drawn or is about to draw any line between heterosexuality and homosexuality in terms of the possible coverage of the privacy right. In the absence of any indication from the Supreme Court that a statute such as our Art. 27, § 554, at least as applied to unmarried persons, is unconstitutional and in view of numerous indications that such a statute, so applied, is constitutional, we conclude that Judge Raker, in making her ruling upon this issue, was not in error.

## Our Own Prior Rulings

Our holding today is fully consistent with the approach we have taken to the constitutionality of § 554 on earlier occasions.

As recently as 1976, we had a factually indistinguishable situation before us in *Gooch v. State*, 34 Md.App. 331, 367 A.2d 90 (1976). There, as here, the defendant was charged with violent rape as well as with a perverted sexual practice. There, as here, the defendant acknowledged that, *inter alia*, an act of fellatio took place but claimed that it was fully consensual on the part of both parties. There, as here, the defendant requested an instruction that consent was a valid defense. There, as here, the instruction was denied. In affirming the conviction, Judge Liss said for this Court, at 34 Md.App. 338, 367 A.2d 90:

"The distinction to be made between the several counts may be found in the testimony of the accused: in the rape and handgun charges, he denied the commission of these crimes; in the perverted practice charge, he made what amounted to a judicial confession.

Section 554, of Article 27 of the Annotated Code of Maryland (1957, 1976 Repl.Vol.) makes it a violation of the criminal law of Maryland to place one's sexual organ in the mouth of any other person. It is immaterial whether the act is a voluntary or involuntary one. *See, Hughes v. State*, 14 Md.App. 497, 287 A.2d 299 (1972). The accused in his own defense testified that the prosecutrix had taken his penis into her mouth. The statement of the accused voluntarily made in open court without any compulsion, threats, promises or other vitiating factor was a binding admission that he had violated the above criminal statute. *See, Brumit v. Florida*, 220 So.2d 659 (Fla.App., 1969); *State v. Snell*, 177 Neb. 396, 128 N.W. 2d 823 (1964); McCormick, *Evidence*, Sec. 160 (1972)."

In *Hughes v. State*, 14 Md.App. 497, 287 A.2d 299 (1972), this Court held that a defendant lacked standing to challenge the constitutionality of § 554 on grounds of over-

breadth. The claim was that the statute infringed upon a constitutional right of privacy concerning their sexual acts with respect to 1) consenting married adults and 2) consenting unmarried adults. Since that case involved a forbidden sexual act with a minor, we held that Hughes lacked the standing to challenge the constitutionality of the act as it might apply to others differently situated. Judge Orth, speaking for this Court, then went on, however, to observe, at 14 Md.App. 503, 287 A.2d 299:

"Nothing we have said in determining that Hughes had no standing to contest the constitutionality of the statute is to be construed as implying that we believe that the statute is unconstitutional as to adults, married or unmarried, consenting to the acts proscribed."

Indeed, after a thorough analysis of the *Griswold* case and its progeny, Judge Orth went on to comment, at 14 Md.App. 505–506, 287 A.2d 299:

"While *Griswold* may not expressly foreclose the application of its rule to unmarried adults, its rationale clearly does not lend itself to either a heterosexual or homosexual relationship between unmarried persons. The rationale of the *Griswold* holding flows from its eulogy of the marital status and lacking such status the rule has no foundation. In such circumstances we see no invidious discrimination between married individuals and unmarried individuals so as to deny equal protection of the laws in any event."

In *Kelly v. State*, 45 Md.App. 212, 412 A.2d 1274 (1980), *aff'd sub nom. Neville v. State*, 290 Md. 364, 430 A.2d 570 (1981), the precise issue was raised that is before us now. Kelly had been charged with abducting his victim at knifepoint, driving her to an abandoned missile site, raping her, and forcing her to engage in fellatio. He testified that the two of them had engaged in the charged sexual activities but that it had been consensual on the part of the young woman. The jury there, as here, acquitted Kelly of all counts in which force or threat of force was an element. He was convicted, as was the appellant here, only of a

sexual offense under § 554. He squarely raised the same constitutional challenge that is being raised here and relied upon the same line of Supreme Court decisions in arguing for an emerging right to privacy with respect to sexual behavior.[3] As against that challenge, we upheld the constitutionality of the Maryland statute. Judge Thompson said for this Court, at 45 Md.App. 217, 412 A.2d 1274:

"We are not persuaded to change the rule and invalidate a legislative prohibition against sodomy, in the absence of a clear lead from the Supreme Court of the United States or from the Court of Appeals of Maryland. We are especially reluctant to invalidate a crime of such ancient vintage. Sodomy was prohibited by Acts of 1793, Chapter 57, Sec. 10. See also Exodus 22:19, Leviticus 18:22–23, and Deuteronomy 23:17."

We would be hard-pressed to hold that Judge Raker was in error for indulging in the presumptive validity of an act of the Maryland Legislature (enacted in 1916 and deliberately reenacted as recently as 1976) and for following our square holdings in *Gooch v. State, supra,* and *Kelly v. State, supra.* In the course of holding her to be in error, moreover, we would be required to overrule both *Gooch* and *Kelly.* We decline to do so.

The only new development since we last considered this issue in 1980 hardly mandates our reversing our position. In *Neville v. State,* 290 Md. 364, 430 A.2d 570 (1981), the Court of Appeals upheld our decision in *Kelly v. State* on other grounds. It held that since the facts of *Kelly* did not show the prohibited sexual conduct to have taken place in private, Kelly lacked the standing to challenge the constitu-

---

**3.** The appellant in *Kelly,* even as the appellant here, reasoned by analogy for an emerging right to privacy with respect to sexual conduct and relied upon the seminal Supreme Court decisions of *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); and *Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)—the same line of cases relied upon by the appellant here.

tionality of § 554 as applied to *private* consensual conduct. The Court of Appeals did no more than indicate that the question is still open as to the constitutionality of noncommercial, heterosexual and consensual sexual practices between adults *when conducted in private.*

### The Examination of the Right to Privacy by the Court of Appeals

In contexts different from that now before us, the Court of Appeals twice explored the contours of the constitutional right to privacy and held that right to be limited in scope. In *Doe v. Commander, Wheaton Police Dep't*, 273 Md. 262, 272, 329 A.2d 35 (1974), it held that the right was not so broad as to compel the expungement of a record of arrest. After reviewing the Supreme Court cases from *Griswold* through *Roe v. Wade*, Chief Judge Murphy quoted with approval from Note, *Privacy in the First Amendment*, 82 Yale L.J. 1462, 1476 (1973):

> "[I]t is also true that 'the definitions of privacy which the *Griswold* approach offers are at best descriptions of a widely shared emotional attitude. Analytically, the reasoning of *Griswold* and *Wade* offers no guidance for separating what privacy is from what it is not; it offers no generalizable definition of the right it is used to protect. Indeed, the extreme breadth of the *Griswold* analysis has produced utmost caution in courts called on to apply it....' "

In *Montgomery County v. Walsh*, 274 Md. 502, 512–513, 336 A.2d 97 (1975), the Court of Appeals held that the right to privacy was not offended by a financial disclosure requirement. In analyzing the limited reach of the constitutional right, Chief Judge Murphy observed:

> "The Supreme Court emphasized in *Roe v. Wade*, ... however, that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' are included in the constitutional guarantee of personal privacy.... If these pronouncements hint that the constitutional right of privacy is of limited scope and not

to be lightly applied, *Paris Adult Theatre I v. Slaton,* ... makes it explicit.... It is thus clear that the Supreme Court has yet to extend the right to privacy much beyond the context of intimate relationships. It is not, therefore, coextensive with every intrusion actionable under the tort of invasion of privacy, nor does it protect rights merely 'important' and not 'fundamental.' " (Citations omitted).

In *Neville v. State,* 290 Md. 364, 430 A.2d 570 (1981), the Court of Appeals was faced with a factual and doctrinal situation virtually indistinguishable from that before us, except that the failure to demonstrate the element of privacy disentitled the appellants there to have the Court of Appeals reach the ultimate merits. Nonetheless, the thorough and scholarly opinion of Judge Rodowsky explored the constitutional merits at some length. After pointing out the two earlier conclusions of the Court of Appeals that it was "clear that the Supreme Court has yet to extend the right of privacy much beyond the context of intimate relationships," 290 Md. at 373, 430 A.2d 570, he went on to quote with approval the disclaimer from *Roe v. Wade:*

"Following a reference to the compelling state interest test for the justification of certain state regulation and to the requirement that such a regulation must be narrowly drawn to express only the legitimate state interests at stake, as those concepts were applied in *Roe v. Wade,* the Court inserted the following footnote:

Contrary to the suggestion advanced in Mr. Justice Powell's opinion, we do not hold that state regulation must meet this standard 'whenever it implicates sexual freedom,' ... or 'affect[s] adult sexual relations,' ... but only when it 'burden[s] an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision.' "

*Id.* at 373–374, 430 A.2d 570. The Court of Appeals noted that the Supreme Court "obviously took pains" to insert the above-quoted disclaimer in a footnote that spoke for a six-justice majority, duplicating an almost verbatim footnote

from another part of *Roe v. Wade* that only commanded a plurality.

The *Neville* opinion went on to observe:

"We discerned that if 'these pronouncements hint that the constitutional right of privacy is of limited scope and not to be lightly applied, *Paris Adult Theatre I v. Slaton*, ... makes it explicit.'" (Citation omitted).

*Id.* at 374, 430 A.2d 570.

In well-considered *dicta*, the conclusion of the Court that the right to privacy does not apply to § 554 was clear:

"It is clear from the foregoing review that there is no holding by the Supreme Court that the right of privacy applies to conduct of the type prohibited by Md. Code, Art. 27, § 554."

*Id.* at 377, 430 A.2d 570.

### Updating the Law is a Legislative Function

It is urged upon us that there has been a massive sexual revolution in the last quarter of a century. In support of this argument, its proponents cite impressive sociological studies, by the Kinsey Institute and by Masters and Johnson and by others, to demonstrate that modes of sexual expression once thought to be "unnatural" or "perverted" are now part of the commonplace experience of a significant majority of Americans, married and unmarried, heterosexual and homosexual. All of this may well be true and we do not suggest for a moment that it is not. Our response, rather, is that such a "Brandeis brief" should be delivered to the Legislature and not to the Court. Unless we are to usurp the legislative function under the guise of a constitutional interpretation, we refer such basic policy decisions to the branch that is more competent to make them and is, furthermore, constitutionally authorized to make them. Our feeling is akin to that of the Supreme Court of Indiana in *Dixon v. State*, 256 Ind. 266, 268 N.E.2d 84, 86 (1971), which had urged upon it such empirical studies:

"We are equally unimpressed by the claim via Dr. Kinsey and others that the acts complained of in this case are widespread in acceptance. Though such might be a valid argument to make to the Indiana Legislature in an attempt to modify the existing laws, it is hardly an argument upon which this Court can justify a judicial decision."

The times may, indeed, be changing and there may be a pressing need to bring the law up to date. The proper method, however, was spelled out by the Supreme Court of Arkansas in *Carter v. State*, 255 Ark. 225, 500 S.W.2d 368, 371 (1973):

"If social changes have rendered our sodomy statutes unsuitable to the society in which we now live, we need not be concerned about the matter because there is a branch of our government within whose purview the making of appropriate adjustment and changes peculiarly lies."

The very facts put forth by the appellant to demonstrate that our sexual mores have undergone significant change and that the anti-sodomy laws have lost touch with contemporary community standards prove our point. Our point is that resort to the legislative branch is not only the proper avenue through which to bring about change but is a fully effective avenue, as well.

The movement for change began with the promulgation of the American Law Institute's Model Penal Code provision which decriminalized adult, consensual, private, sexual conduct. It is, of course, to be noted that the Model Penal Code is not a brief for an appellate court but a recommendation for legislative reform. The comment accompanying this provision of the Model Penal Code pointed out that in recent years such nations as France, Great Britain, Canada, Mexico, Italy, Denmark, and Sweden have all repealed their sodomy statutes. Model Penal Code, § 207.5, comment 276, at 278 (Tent.Draft. No. 9, 1955). Again, our point is made. All of those nations repealed their sodomy statutes through legislative action.

A major impetus to change in recent years was the famous Wolfenden Report, which in the 1960's recommended to the British Parliament the repeal of the sodomy statutes. Parliament initially considered the recommendation and rejected it. On the second try in 1967, however, Parliament eliminated the crime. Again, legislative action was fully effective in bringing about desired reform.

Following the recommendation of the Model Penal Code, Illinois repealed its sodomy law in 1961. Connecticut followed suit in 1969. During the decade of the 1970's, eighteen additional states—Alaska, California, Colorado, Delaware, Hawaii, Indiana, Iowa, Maine, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Pennsylvania, South Dakota, Washington, West Virginia, and Wyoming—followed the example of Illinois and Connecticut. Wisconsin decriminalized sodomy in 1982. What all of this demonstrates is that there is no impediment to legislative reform when the people of a sovereign state want such reform.

In the 1987 session of the Maryland General Assembly, Senate Bill 443 and House Bill 816 proposed the repeal of Article 27, §§ 553 and 554. Neither Bill was enacted into law. There is nothing, however, to preclude future efforts at repeal. If the citizens of Maryland want it, they will, through their popularly elected representatives, get it. The system works as it was designed to work. We don't need Platonic Elders looking over the shoulder of the Legislature.

In answer, therefore, to the appellant's claim that the anti-sodomy statutes do not reflect current community standards, we find prophetic the words of Justice Black in his dissenting opinion in *Griswold v. Connecticut*, back when all of this constitutional debate began:

"[W]e were told that the Connecticut law does not 'conform to current community standards.' But it is not the function of this Court to decide cases on the basis of community standards. We are here to decide cases 'agreeably to the Constitution and laws of the United States.' ... If, as I should surely hope, the law before us

does not reflect the standards of the people of Connecticut, the people of Connecticut can freely exercise their true Ninth and Tenth Amendment rights to persuade their elected representatives to repeal it. That is the constitutional way to take this law off the books" (Footnote omitted).

381 U.S. at 530–531, 85 S.Ct. at 1707 (Black, J., dissenting).

### Considerations at Sentencing

The appellant's second contention is that Judge Raker improperly considered, at the time of sentencing, evidence as to offenses of which the appellant had been acquitted. It suffices to say that we have read the transcript and find nothing improper about what Judge Raker considered or how she considered it.

### Cruel and Unusual Punishment

■ Although the maximum sentence for a violation of Art. 27, § 554 is ten years, the appellant was sentenced to five years incarceration. That sentence was suspended and the appellant was placed on supervised probation for five years. The constitutional propriety of that sentence, pursuant to the Eighth Amendment and according to the guidelines of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), would be a fascinating topic to explore more fully on some other occasion. For the moment, it is enough to note that we do not find it to have been in any way unconstitutional or otherwise improper.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

WILNER, Judge, dissenting.

Steven Schochet was sentenced to five years in prison because, on the evening of October 3, 1986, he engaged in an act of fellatio with Dovie Sullivan. It seems apparent from this record that Mr. Schochet and Ms. Sullivan were competent adults, that the act occurred in the privacy of Ms. Sullivan's apartment, that they were alone at the time

—Ms. Sullivan's daughter being asleep in another room— and that the act was part of a broader range of sexual conduct between the parties, including vaginal intercourse, that the jury implicitly found was freely and voluntarily engaged in by Ms. Sullivan.[1]

In a precise and scholarly Opinion, the panel majority sees nothing unconstitutional about Mr. Schochet being sentenced to prison for engaging in that act under that circumstance. I do.

There is much in Judge Moylan's Opinion with which I agree. I agree, for example, that:

(1) the United States Supreme Court has recently made clear (in a 5–4 decision) that there is no Federal Constitutional right to engage in homosexual conduct that is proscribed by State law;

(2) that Court has strongly implied, but never squarely held, that it would be an impermissible invasion of a Constitutionally protected right of privacy for the Legislature to criminalize this kind of activity when engaged in by a married couple in private, shielded from any reasonable prospect of public view; and

(3) neither the Supreme Court nor the Maryland Court of Appeals has yet given a clear, definitive indication of whether any such right of privacy applicable to married couples would also apply to a competent, adult, heterosexual, un-

---

**1.** Technically, of course, the jury's verdicts establish no more than that it had a reasonable doubt (1) as to whether the alleged anal intercourse occurred at all and (2) whether any of the acts, other than the fellatio, were committed (i) with force and (ii) without Ms. Sullivan's consent. In terms of the issue before us, however, whether the jury simply entertained a reasonable doubt or affirmatively believed that Ms. Sullivan consented to whatever occurred is of little moment. No greater evidence of force or lack of consent was presented with respect to the fellatio than with respect to the other acts, and so one might quite reasonably suppose that, if the jury had been apprised that consent was a valid defense to the charge based on the fellatio, appellant would have been acquitted of that offense as well. Indeed, if one accepts Mr. Schochet's version of the event, as the jury apparently did, Ms. Sullivan actually instigated the act of fellatio.

married couple when engaging in this activity under similar circumstances.

There is, in other words, a lack of controlling precedent in this State clearly mandating one result or the other in this case.

The panel majority, recognizing this void, opts for affirmance, seemingly on two grounds: one, that the statute proscribing this conduct, even when undertaken by married couples, is presumptively valid; and two, unless and until the Supreme Court clearly directs otherwise, we ought not to overturn the statute but should defer instead to the Legislature.

I have no quarrel with either of those propositions, as general statements of principle. But they necessarily must yield to an even greater imperative. John Marshall expressed the point so well in *Marbury v. Madison*, 1 Cranch 137, 177–78, 5 L.Ed. 60, 73–74 (1803):

> "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.
>
> So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.
>
> If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.
>
> Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts

must close their eyes on the constitution, and see only the law.

This doctrine would subvert the very foundation of all written constitutions."

That authority—that obligation—is not limited to the Supreme Court. It is equally the duty of any court of competent jurisdiction and has been so regarded throughout most of our national history. We have never shied from declaring presumptively valid laws unconstitutional, when the conflict seems clear, merely because no higher court had previously done so. We look at the statute and we look at the Constitution, and, if the one appears to us to be repugnant to the other, we declare it so and give effect to the higher, controlling provision. We obviously may not exercise this authority capriciously; we are constrained to give due deference to the Legislature and to sustain its enactments unless their repugnancy to the Constitution is clear. But when that repugnancy *is* clear—clear to *us*—we have no choice, if we are to remain true to our own oaths of office, other than to strike down the offending enactment.

The majority recognizes that there is a Constitutionally-based right of privacy, notwithstanding the lack of any mention of such a right in the Constitution itself. The issue is whether this kind of activity falls within it. Judge Moylan reviews in depth and in some detail pronouncements from the Justices of the Supreme Court since *Poe v. Ullman*, concluding from some grand matrix of all their sayings that this activity is probably not protected, at least when carried on by unmarried couples. What the majority, in effect, has done is to take a frozen slice of Constitutional history, from 1965 to 1987, and to assume that this steadily emerging Constitutional principle will develop no further. That is a nice conservative view, but it is unrealistic, because it leaves a most fundamental legal principle in a state of absolute illogic.

The problem, essentially, is an analytical one; on what basis, by what standard, should the law decide which of the several kinds of intensely personal relationships, activity,

and expression that people have or engage in is to be shielded from discretionary governmental intrusion and interference? The majority, following a sort of *ad hoc* development in the Supreme Court, parcels this out on the basis of whether the relationship, activity, or expression in question is included within this somewhat ill-defined and contourless zone of privacy. Inclusion means it is shielded; exclusion means it is not; it is a sort of "all or nothing" proposition. I suggest a somewhat different framework of analysis, one that finds equal support in Supreme Court case law.

My thesis, as it would apply in this case, is as follows. I believe (1) that there *is* a Constitutionally protected zone of privacy, ill-defined perhaps but nonetheless existing, that shields certain fundamental personal conduct and expression from substantial governmental interference; (2) that the conduct at issue here, when engaged in under the circumstances noted, falls within that zone of privacy; (3) that, although inclusion within this zone does not necessarily endow an activity with total immunity from governmental interference, it does require that the government show a strong and compelling justification for the interference; and (4) that no such showing has been made here.

Unlike the majority, I do not believe that the Constitutional right of privacy was born in 1965 or that its parents were Estelle Griswold and the State of Connecticut. It has antecedents in Socrates, Cicero, Rousseau, and Locke, among many others; it is given expression throughout the Declaration of Independence, and indeed the systematic violation of it by Parliament and its agents was a major cause of the Revolution. But even putting all that aside, the Supreme Court itself has seemingly recognized a more distant root. In *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), the Court, through Justice Blackmun, observed that while "[t]he Constitution does not explicitly mention any right of privacy ... [i]n a line of decisions ... going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35

L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy does exist under the Constitution."

In 1928, Justice Brandeis, repeating sentiments that he and Samuel D. Warren had expressed 38 years earlier, wrote:

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man."

That passage, written in dissent in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), was quoted, verbatim, by the majority in *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542 (1969), for the proposition that "also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy."

The majority, of course, does not deny the existence of this right of privacy. I delve a bit into its history only to illustrate that it was not something capriciously pulled out of the air by Justices Harlan and Douglas but has a much deeper meaning and tradition. That is significant, I suggest, in determining its scope.

I freely acknowledge that this right of privacy is not well defined; neither, of course, is "due process of law" or "unreasonable searches and seizures" or "cruel and unusual punishments." These are broad concepts that take their meaning not just from a frozen slice of history but from contemporary social mores and institutions. Changed

perceptions of what is acceptable *does* have Constitutional significance. Public flogging was once permitted, as was hanging for felonies other than murder; it no longer is, *Constitutionally.* As Justice Frankfurter commented in *National Mutual Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 1195–96, 93 L.Ed. 1556 (1949) (in dissent): "Great concepts like ... 'liberty' ... were purposely left to gather meaning from experience. For they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged."

This notion would seem as applicable to public attitudes about sexual contact between men and women as to any other aspect of our social fabric.

Throughout history, the subject of sex—i.e., sexual contact and intercourse—has been shrouded in hushed tones and mystery, encrusted with ecclesiastical armor. The whole thrust of society, usually led by old men, has been to place barriers of one kind or another on the expression of this most basic function of all living things, including people. To the extent that these barriers were intended to promote, protect, exalt, and preserve the institution of marriage and with it the nuclear family, they obviously had a significant and useful societal, economic, and therefore political purpose and could reasonably be regarded as within the proper purview of government, even one founded upon notions of social contract, as ours was. But if and to the extent they have no such connection or cease to have any such connection, and simply regulate this kind of very personal conduct for no apparent reason, the question of authority is legitimately raised.

The Supreme Court has, I concede, moved haltingly in this area, and properly so. It is not a legislative body; nor is it a Constitutional Convention permanently in session. But it has recognized that certain aspects of sexual relations between men and women are immune from governmental intrusion, absent some compelling, rational basis for

the intrusion. And despite the ardent wishes of the majority, the Court has not limited this protection to married couples, and it has not limited it merely to decisions regarding procreation. See *Roe v. Wade, supra.*

Justice Douglas asked in *Griswold,* "Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives?" and then answered the question, "The very idea is repulsive to the notions of privacy surrounding the marriage relationship." 381 U.S. at 485–86, 85 S.Ct. at 1682.[2] What makes intimate sexual contact between men and women less private because they are not married to one another? What makes the intrusion into the bedroom less repulsive because the occupants are not husband and wife? What makes it less repulsive if the object of the search is not contraceptives but the form of sexual expression?

Sexual activity involves a use of one's body and an expression of one's feelings, both of which have found at least limited protection in the Constitution. Whatever the perimeter or contours of the zone of privacy—the fenced-in area from which a prying government should be largely excluded—may be, I fail to see how this kind of conduct could not be regarded as included within it.

---

**2.** Some—perhaps even Justice Douglas—may have regarded this rhetorical exchange as a bit of hyperbole when written 23 years ago. Who indeed would envision the police snooping into marital bedrooms? See *Ricks v. State,* 312 Md. 11, 537 A.2d 612 (1988), where, two months ago, a unanimous Court of Appeals (affirming this Court) sustained the "non-consensual video surveillance by police of suspected illegal drug activities within a residential apartment in Baltimore City." *Id.,* 13, 537 A.2d 612. Officers "entered the air ducts of the apartment through the roof, shaved away part of the dry wall and implanted a miniature camera, focused on the dining room of the apartment. After *several weeks* of observation and *twenty-five hours* of recorded video tape, a search warrant was issued to search the apartment...." (Emphasis added.) *Id.,* 18, 537 A.2d 612. If the police can install a camera in the dining room, why not in the bedroom? The requisite probable cause is not all that hard to come by. The hyperbole, if that's what it was, has become a very real possibility.

Under my thesis, that would not end the inquiry. The Court made clear in *Roe v. Wade* that rights of this type are not absolute or unqualified but "must be considered against important state interests in regulation." 410 U.S. at 154, 93 S.Ct. at 727. But, as the Court noted further, "[w]here certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' . . . and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Id.*, 155, 93 S.Ct. at 728.

What are the State interests at stake here? None are mentioned by the majority. Is there a public health issue? None has been identified. Does this prohibition in any way protect, enhance, or preserve the institution of marriage or the family unit? We are not told how. Does the proscribed conduct cause or lead to disruptive or antisocial behavior or otherwise threaten public order? There is no such assertion. Does it interfere with other private rights deserving of protection? No such claim is made. Well, what then is the compelling State interest that justifies sentencing Mr. Schochet to prison?

The only ground asserted for this kind of criminal sanction is some vague notion of public morality, some unarticulated need to punish acts that the Legislature once regarded as "unnatural or perverted" and that the majority holds to be "unorthodox." So let us explore that for a moment. Public morality may be a valid basis for regulation. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). But there has to be some evidence of what that public morality is; the term itself cannot supply the fact.

The *fact* is that public morality, to the extent documented, condones rather than condemns this activity, and the degree of condonation has not only dramatically increased over the past 40 years but is approaching universality, at least among married couples. The conduct, in other words, is no longer regarded by the people as unnatural, or per-

verted, or unorthodox.[3]

The majority, apparently, views this as a matter for the Legislature alone to consider; but I submit that, if the only asserted basis for a criminal statute is a perception of public morality, it is a matter for the courts as well. To hold otherwise would be to allow the power, under the guise of protecting public morality, to impose criminal sanctions on masturbation and all variety of non-coital sexual contact, even down to kissing and hand-holding, when carried on by consenting adults in private. Would the majority commit that authority too to the State Legislature? If not, why not?

I think it clear that this law, as applied to adult, consenting, competent heterosexual couples who engage in this activity under the circumstances evident in this case, abridges fundamental liberties protected by the Constitution and is therefore, to that extent, invalid.[4] I am not

---

**3.** In his first report, *Sexual Behavior in the Human Male* (1948), Alfred Kinsey found that fewer than half of the men interviewed engaged in fellatio or cunnilingus, even during marriage. In the category of highest incidence—married men with 13+ years of education—45.3% performed cunnilingus and 42.7% engaged in fellatio. Five years later, in his *Sexual Behavior in the Human Female*, Kinsey reported that 54% of the married women interviewed had engaged in pre-coital cunnilingus and 49% had engaged in fellatio. See also P. Gebhard and A. Johnson, *The Kinsey Data* (1979). In their 1977 Redbook Report on Female Sexuality, C. Tavris and S. Sadd found that 93% of wives responding reported having engaged in cunnilingus and 91% had engaged in fellatio. They concluded from this response that, "Today it is clear that if the sexual revolution has occurred anywhere, it is in the practice and acceptance of oral sex. Among people under age twenty-five, it is virtually a universal part of the sexual relationship."

P. Blumstein and P. Schwartz have reported similar statistics—93% of heterosexual couples had engaged in cunnilingus and 90% had engaged in fellatio. See also W. Masters, V. Johnson, and R. Kolodny, *Human Sexuality* 393 (1985). Nor is this phenomenon confined to the young. E. Brecher reports in *Love, Sex, and Aging* 358–59 (1984), that, among people over 50, 49% of women and 56% of men engaged in cunnilingus and 43% of women and 49% of men engaged in fellatio.

**4.** One of the interesting and unique things about the crime, as stated in § 554 is that, when committed in the manner noted here, it is not

alone in that view.[5]

As a final note, I would point out that, as the Constitutional right of privacy now seems clearly to rest upon the "due process" clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution, it would, in this State, rest as well on Md. Declaration of Rights, art. 24, which has consistently been interpreted by the Court of Appeals as the equivalent of the Federal due process clauses. See *Lodowski v. State*, 307 Md. 233, 248–49, 513 A.2d 299 (1986). To avoid unduly alarming the panel majority, I hasten to add that, as *Lodowski* makes clear, art. 24 is no broader than the Federal due process rights, and I therefore do not suggest (and indeed would oppose) grounding this right solely on the State Constitution. The two provisions should continue to be regarded as synonymous. Thus, if the activity is protected under the Federal Constitution, as I believe it is, it is also protected under the State Constitution.

---

only "victimless," but the would-be victim is equally guilty of the offense. Whoever places *or takes* into his or her mouth the sexual organ of another person is guilty. Given the jury verdict in this case, one might wonder why Ms. Sullivan was not also charged with the offense.

**5.** See *People v. Onofre,* 415 N.E.2d 936 (N.Y.1980), *cert. denied* 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981); *State v. Pilcher,* 242 N.W.2d 348 (Iowa 1976); *Post v. State,* 715 P.2d 1105 (Okla.Crim. App.), *cert. denied* — U.S. ——, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); *Commonwealth v. Balthazar,* 366 Mass. 298, 318 N.E.2d 478 (1974); *Commonwealth v. Reilly,* 5 Mass.App. 435, 363 N.E.2d 1126 (1977); *State v. Hill,* 166 N.J.Super. 224, 399 A.2d 667 (1978), *rev'd on other grounds* 170 N.J.Super. 485, 406 A.2d 1334 (App.Div.1979).